2022 IL App (1st) 171739-B
Opinion filed August 1, 2022

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No 95 CR 6668 (01) |
| | ) | |
| MARTIN HILL, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Dennis J. Porter, |
| | ) | Judge, presiding. |

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Walker and Johnson[*] concurred in the judgment and opinion.

**OPINION**

¶1 After a jury found Martin Hill guilty of two counts of first degree murder and one count of attempted first degree murder—offenses he committed at age 15—the trial court sentenced Hill to a mandatory term of life in prison to run consecutively with a 30-year sentence for the attempt. We affirmed the trial court's judgment on direct appeal. *People v. Hill*, No. 1-98-2383 (2001) (unpublished order under Illinois Supreme Court Rule 23). Hill filed a postconviction petition

---

[*]On Justice Griffin's retirement, Justice Johnson was substituted on the panel. Justice Johnson has reviewed the briefs and record in formulating her opinion.

raising several claims, including a challenge to his life sentence as unconstitutional. The parties agreed that Hill's mandatory life sentence violated the principles established in *Miller v. Alabama*, 567 U.S. 460, 465 (2012), which holds that mandatory life without parole for a juvenile defies the eighth amendment's ban on cruel and unusual punishment. The court resentenced Hill to two concurrent terms of 54 years for first degree murder to run consecutively with a 6-year sentence for attempt, which Hill contends still violates *Miller* and its progeny.

¶2      The State conceded, during oral argument, that Hill's sentence would be unconstitutional if it is a *de facto* life sentence. But, the State argued, because of Hill's eligibility for day-for-day good behavior credit potentially permitting his release after 30 years in prison, he did not receive a *de facto* life sentence. In our first opinion we disagreed. At the time, our appellate court's overwhelming weight of authority had concluded that good-time credit had no impact on determining whether a defendant's sentence constituted a *de facto* life sentence. See *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 19; *People v. Daniel*, 2020 IL App (1st) 172267, ¶ 26; *People v. Thornton*, 2020 IL App (1st) 170677, ¶ 22; *People v. Simental*, 2021 IL App (2d) 190649, ¶ 18. But see *People v. Evans*, 2017 IL App (1st) 143562, ¶ 14 (applying day-for-day credit to determine whether defendant's sentence constituted life term).

¶3      Dissatisfied with that result, the State filed a petition for leave to appeal. The Illinois Supreme Court held the State's petition while it decided *People v. Dorsey*, 2021 IL 123010. In *Dorsey*, the court concluded that we must consider the possibility of a defendant's early release based on sentence credit when determining the applicability of *Miller* principles to his or her sentence. *Id.* ¶ 65. After *Dorsey*, the Illinois Supreme Court entered a supervisory order directing us to vacate our earlier opinion and consider how *Dorsey* affects our judgment.

¶4     We have vacated our previous opinion and now conclude, bound as we are by *Dorsey*, that Hill's new sentence is not a *de facto* life sentence. By definition, his new sentence cannot violate *Miller* under either the eighth amendment or the proportionate penalties clause. Applying traditional sentencing review, however, we find the trial court abused its discretion by minimizing the veritable mountain of evidence explaining the impact of Hill's youth and circumstances on his criminal conduct and further explaining his ability as an adult to conform his conduct with the law. Given this, we reverse and remand for the trial court to reweigh Dr. Cunningham's testimony in a manner not inconsistent with this opinion.

¶5                              Background

¶6     In 1998, Hill was convicted of two counts of first degree murder and one count of attempted murder relating to a shooting on December 29, 1994. At the time, Hill was 15 years old.

¶7     Hill told authorities that, before the offense, he was out walking when a car approached. The driver was Leon Jones, Tommy Wilson sat in the front passenger seat, and McKinzie Ranson sat in the back passenger seat. Wilson, 18 years old, instructed Hill to get in the back seat, and Hill complied, claiming he sat behind Jones on the driver's side. A few minutes later, Jones pulled the car alongside the victims' car, and Wilson and Ranson shot at the car. Hill told authorities that Wilson and Ranson were the shooters.

¶8     At Hill's trial, two eyewitnesses identified Hill as the front seat passenger and Ranson as sitting in the back on the passenger side. They saw shots coming out of the car from both the front and back passenger side. Notwithstanding the conflicting testimony, the jury convicted Hill as a shooter.

¶9     The trial court originally sentenced Hill to two concurrent terms of mandatory life in prison without parole for each of two counts of first degree murder, with a consecutive term of 30 years in prison for the attempt.

¶10    This court affirmed Hill's convictions on direct appeal. In 2001, Hill filed a *pro se* petition for postconviction relief. While it was pending, the United States Supreme Court decided *Miller*, 567 U.S. 460. Based on *Miller* and *People v. Davis*, 2014 IL 115595, which held that *Miller* applied retroactively on postconviction review, the parties agreed that Hill should be resentenced. Hill's counsel, the State, and the circuit court believed resentencing must precede resolving other postconviction claims. Although all agreed that Hill's underlying sentence should be vacated, an order—written or oral—formally granting postconviction relief or vacating the original sentence is absent from the record.

¶11    The circuit court held a new sentencing hearing. Based on the law at the time of the offenses, the parties agreed that the sentencing range for each murder was 20 to 60 years, to run concurrently, and the sentencing range for the attempted murder was 6 to 30 years, to run consecutively to the murder sentences.

¶12    During Hill's resentencing hearing, Dr. Mark Cunningham testified as an expert in clinical psychology and forensic psychology. Dr. Cunningham reviewed Hill's records and conducted interviews with Hill and his family members. He testified on general psychological trends and risk factors in teens and how those factors applied to Hill. Dr. Cunningham concluded that Hill had various psychological and behavioral issues that would have affected his decision-making ability.

¶13    Dr. Cunningham explained that teens are less capable than adults of mature judgments and experience a higher propensity for engaging in risky and illegal behaviors. Similarly, teens have trouble self-regulating and controlling their impulses; thus, they are more susceptible to negative

4

external influences. Given their desire for approval and fear of rejection, teens succumb to peer pressure even without direct coercion are far more likely than adults to commit crimes in a group context or where the presence of peers is a motivating factor. Not only does the brain of teens not operate the same way as an adult brain, but this immaturity lessens the level of their moral culpability.

¶14 Neurodevelopmental factors could reduce a teen's functional maturity. The neurodevelopmental factors that reduced Hill's functional maturity relative to other 15-year-olds included fetal cigarette exposure, his mother's weight loss while pregnant with him, ADHD-type symptoms, anoxic experiences where the brain was deprived of oxygen, and a history of head injury. In addition, Dr. Cunningham believed that Hill, though he did not have an ADHD diagnosis, displayed symptoms on the ADHD continuum, including inability to focus, hyperactivity, and impulsivity.

¶15 Dr. Cunningham noted Hill had a history of traumatic experiences, including physical abuse by his mother from belt whippings that left enduring welts, a climate of hostility between his parents, significant recurrent exposure to prostitution, exposure to community violence, and sexual abuse by women 5 to 15 years older. Hill, at age 12, also witnessed a peer being gruesomely crushed to death by an elevator in Hill's building. Hill lived in a housing project characterized by heavy gang activity, pervasive drug dealing, and drug abuse. Eighty percent of male teens in the housing project engaged in felony-level criminal activity. Hill personally observed numerous acts of violence such as multiple shootings. Abused and maltreated youth, like Hill, often show immediate and long-term psychological, emotional, and physical effects, including insufficient capacity for emotional self-regulation, drug or alcohol problems, and violent or criminal behavior.

¶16    Hill had many risk factors, which effects Dr. Cunningham considered catastrophically cumulative. Dr. Cunningham concluded (i) Hill's participation in the offense reflected a 15-year-old's brain immaturity, including poor judgment, faulty values, and empathy deficits; (ii) the impulsivity and co-participation characterizing Hill's involvement fit the brain immaturity of a 15-year-old; (iii) certain neurodevelopmental factors reduced Hill's functional maturity relative to other 15-year-olds; (iv) Hill's functional maturity at the time of the offense was negatively impacted by traumatic experiences; (v) Hill's daily marijuana use further compromised his functional maturity; (vi) Hill lacked sufficient maturity, perspective, and ego strength to resist the pervasive influence of his violent and corrupt community; and (vii) family dysfunction and distress limited the ability of Hill's parents and relatives to constructively parent him or mitigate the effects of the surrounding community.

¶17    On cross-examination, Dr. Cunningham acknowledged that Hill was not predestined to commit murder based on his adverse developmental experiences, although he was highly inclined for a criminally violent outcome. Dr. Cunningham allowed that the co-occurrence of youthfulness and adverse developmental experiences might not invariably result in a criminally violent outcome, though it does significantly increase its likelihood.

¶18    Dr. Cunningham also testified that Hill's risk of recidivism as lower than the average parolee, finding that he has a greater likelihood of successful reintegration. To support this, Dr. Cunningham pointed to Hill's lack of prior adult arrest record, lack of prior prison sentences, the long time he had served in prison, his recent prison disciplinary record showing no serious infractions, family support, housing support from St. Leonard's House, and employment prospects. Also, Hill's conduct as an immature 15-year-old was not predictive of his risk of offending as an

6

adult—decisions made with an immature brain are not predictive of long-term criminality in the same way decisions might be if made by an adult with a fully developed brain.

¶19    Hill's behavior while incarcerated also indicated significant gains in psycho-social maturity and efforts toward rehabilitation. Two corrections officers testified at the resentencing hearing about their interactions with Hill while incarcerated, calling him a model inmate. Hill's prison records indicate several jobs that required the trust of officers.

¶20    Though the court did not believe Hill's criminal conduct inevitable, it did consider it unsurprising given Hill's background. The court also noted it could be reasonably argued that the older offenders pressured Hill to participate. The court described the 15-year-old Hill as a "dangerous monster" but addressed his significant improvement in conduct while in jail, stating:

> "…the crime you committed was a terrible, terrible crime. It was an ambush just like the State characterized it against people who are just completely defenseless. It was a serious, serious, serious crime and seriously you have answered for it.
>
> And then what have you been since up to this point? Well, you have been in a structured environment. But I must say to your credit, you've handled yourself pretty well I have to say. Your record in the penitentiary is I would say close to exemplary, at least as good as anyone else's that I've ever seen that has been in that long, quite frankly. And you have some people that have put up a shoulder for you from the jail over there, how you have conducted yourself in jail. You've made significant improvement. So I think it would be fair to remove the monster head from you at this point, quite frankly.

What you will become, that's a little harder to predict. But I would note that it doesn't seem to be any significant gang activity in your background during your part in the [D]epartment of [C]orrections.

* * *

I think a significant reduction of your sentence is warranted, quite frankly. It still has to be a significant sentence based upon the gravity of what you did. I would point out I cannot ignore the fact that you were one of the shooters in this, and your degree of participation was as high as it could be, that being one of the shooters.

Though, having considered—the other thing I might add about the law, I read *Miller* to say that anything that makes it a mandatory life sentence on a juvenile isn't going to cut it. And, therefore, that would include any mandatory life sentence, it would include any mandatory consecutive sentence."

In resentencing, after noting that Hill's sentence warranted a significant reduction, the circuit court nevertheless focused on the seriousness of the crime and Hill's role as a shooter. The court resentenced Hill to concurrent terms of 54 years in prison for each murder count, and a consecutive term of 6 years for the attempt count. The circuit court denied Hill's motion to reconsider sentence, and Hill appealed to this court. Hill still has other pending postconviction claims unrelated to *Miller*.

¶21                                Jurisdiction

¶22    First, we must confront an odd jurisdictional wrinkle neither party addressed in their briefs. Arguably, the circuit court lacked jurisdiction to enter the new sentences because we cannot find an oral or written order formally granting postconviction relief and vacating the original sentences.

8

Without an order, we lack jurisdiction save for the authority to vacate the circuit court's void judgment. *People v. Bailey*, 2014 IL 115459, ¶ 29.

¶23 Well-settled law states that proceedings on postconviction petitions "[are] not part of the criminal process" but rather collateral civil proceedings. *People v. Johnson*, 191 Ill. 2d 257, 270 (2000). This means the filing of a postconviction petition does not continue the underlying criminal case; the circuit court loses jurisdiction over the criminal case 30 days after the entry of its final judgment. *People v. Lake*, 2020 IL App (1st) 170309, ¶ 14. Here, the circuit court entered its final judgment on May 12, 1998, and the record does not reveal any proceedings on a timely filed motion to reconsider sentence. As a result, the circuit court lost jurisdiction over the underlying criminal case on June 12, 1998. Only by granting postconviction relief and entering an appropriate order can the circuit court reacquire jurisdiction over the criminal case. See 725 ILCS 5/122-6 (West 2018) ("If the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders *** as may be necessary and proper.").

¶24 In their briefs, Hill and the State assert that the circuit court vacated Hill's original sentences and ordered a new sentencing hearing based on a claim under *Miller*, 567 U.S. 460, that Hill raised in his postconviction petition. We have examined the portions of the record cited by both parties. No order vacating the sentences exists. Hill cites the State's sentencing memorandum, which says, "On November 16, 2015, th[e circuit] court signed an order granting [Hill's] petition and vacating [his] sentence of life without parole." But the November 16, 2015, order says, "Defendant remanded to CCDOC. No Bail. B/A 12-15-15." Likewise, the report of proceedings contains no oral order vacating Hill's sentence. This discussion took place before Judge Joyce, substituting for Judge Porter, on November 16, 2015:

"THE COURT: I can appreciate what you say when you mean *Miller v. Alabama* and everything else, but has the sentence actually formally been vacated? And are you asking me to do that now because I suppose I really ought to do that and then perhaps set no bail and remand him to Cook County Jail. Otherwise the jail might just send him back to IDOC if they think he has an IDOC sentence.

COUNSEL: I think to be safe entering an order vacating the sentence would be appropriate. That has been our understanding with Judge Porter is that the sentence if it had not been vacated, would be vacated.

THE COURT: So I'll say defendant remanded to Cook County—Is that what the State believes ought to happen, remand him to Cook County Jail?

STATE: Yes, Judge.

\* \* \*

THE COURT: By agreement 12-15-15, remanded to the Cook County Jail, held pursuant to no bail."

Once the case made it back to Judge Porter, still there is no order vacating Hill's underlying life sentence. The only other mention of vacatur appears in the proceedings on January 24, 2017:

"COUNSEL: [Mr. Hill] still doesn't understand why we're doing the sentencing part first, the *Miller* part before the post conviction. And he said—He asked if Your Honor could explain to him why this is happening. We talked about it, but he wants to hear it from you.

\* \* \*

THE COURT: Because you can't have a post conviction without a sentence.

You don't have a judgment. I can't do the post conviction without a sentence.

Okay."

The court and the parties operated on the mistaken belief that Hill's sentence had been vacated.

¶25 Thus, under the terms of the Post-Conviction Hearing Act, the circuit court lacked jurisdiction to resentence Hill—the circuit court neither granted postconviction relief nor entered "an appropriate order with respect to the judgment or sentence in the former proceedings." 725 ILCS 5/122-6 (West 2018).

¶26 Nevertheless, the revestment doctrine applies, as the State contended at oral argument. The revestment doctrine allows a court to reassert jurisdiction over a matter where jurisdiction has otherwise been lost. *People v. Kaeding*, 98 Ill. 2d 237, 240 (1983). For the doctrine to apply, both parties must (i) actively participate in the proceedings, (ii) fail to object to the untimeliness of the late filing, and (iii) assert positions that make the proceedings inconsistent with the merits of the prior judgment. *Bailey*, 2014 IL 115459, ¶ 25.

¶27 Both parties actively participated in the resentencing proceedings. Both Hill and the State filed resentencing memoranda, both Hill and the State called live witnesses at the sentencing hearing, and both Hill and the State made arguments to the circuit court for what they believed was an appropriate new sentence. Resentencing took place 19 years after the original sentence, yet, the State did not object to the untimeliness of Hill's attack on his sentence. See *People v. Buffkin*, 2016 IL App (2d) 140792, ¶ 13 ("the State has failed to object to the untimeliness of defendant's attack on his sentence"). Finally, although Hill and the State acknowledged that a discretionary life sentence was still available to the circuit court, both parties agreed that a

mandatory life sentence was off the table. Those positions conflict with the merits of the original judgment, which imposed a statutorily mandated life sentence.

¶28    Because the circuit court had revested jurisdiction, we also have jurisdiction and can now proceed to the merits.

¶29    We offer a final note of guidance to the circuit court. Counsel for one of Hill's codefendants described the postconviction proceedings as being in "an unusual posture." The circuit court agreed and expressed concern about "what happens when you have [an] unusual [posture] and you couple that with postconvictions," comparing it to getting "mired into the swamp." We think this jurisdictional swampiness could have been avoided by keeping the claims in the postconviction petition together.

¶30    As reflected in the record excerpts, the parties and the court seemed to think resentencing Hill had to precede considering his other claims for postconviction relief. In our view, this was backward. Many of the claims in Hill's postconviction petition, if successful, would have granted him a new trial. In his amended petition, counsel raised a claim of actual innocence. Success on these claims would have mooted the sentencing issue by vacating the entire underlying judgment. Because Hill's sentence was only voidable, not void (see *id.* ¶ 6 (citing *People v. Castleberry*, 2015 IL 116916)), the circuit court could have deferred Hill's *Miller* claim. The posture need not have been "unusual."

¶31                                    Analysis

¶32    The parties' briefs raise three disputes: (i) whether Hill's new 60-year sentence is a *de facto* life sentence given his eligibility for day-for-day sentence credit; (ii) whether Hill's new 60-year sentence comported with the requirements of the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois

Constitution (Ill. Const. 1970, art. I, § 11); and (iii) whether his new sentence, even if constitutional, nonetheless constitutes an abuse of discretion. In our original opinion, we addressed only Hill's eighth amendment challenge, and at oral argument, the State conceded that should Hill's sentence constitute a life sentence, it is unconstitutional because the trial court concluded that Hill had rehabilitative potential. We appreciate the State's candor.

¶33     Our primary task, in light of the State's concession, was whether to follow the line of cases finding statutory sentence credit irrelevant to determining whether a sentence constitutes a *de facto* life sentence. In our original opinion, we followed *Peacock*, 2019 IL App (1st) 170308, ¶ 19, where the defendant's 80-year sentence subject to day-for-day good behavior credit constituted a *de facto* life sentence. *Peacock* emphasized that the Department of Corrections, not the court, had discretion in awarding and revoking good time credit, and "the trial court has no control over the manner in which a defendant's good conduct credit is earned or lost." *Id.* The court held that the defendant was not sentenced to 40 years but 80 years in prison, even though his inmate status report indicated that his projected release from prison would be after serving slightly less than 40 years. *Id.* ¶ 20. The uncertainty of the actual date of release, subject to the Department of Corrections' discretion, pushed the court to hold day-for-day credit could not be considered in a sentence determination.

¶34     In our view, the court in *Peacock* amply supported its conclusion that "day-for-day credit is not guaranteed" with decisions from this court and our supreme court. *Id.* ¶¶ 19-20 (collecting cases). *Peacock*'s interpretation also appeared to adhere closely to the supreme court's analysis in *People v. Buffer*, 2019 IL 122327. The language in *Buffer* focuses on the sentence "imposed," not the sentence served. *Id.* ¶ 41. The court also considered and rejected the State's statistical approach to the "survivability" of a sentence. *Id.* ¶¶ 30-34. In other words, the court declined to focus its analysis on the potential release date. *Id.* ¶¶ 33-34. Instead, the court repeatedly emphasized its

reliance on sentencing judgments reached by the legislature as the entity "better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *Id.* ¶ 35.

¶35 The Illinois Supreme Court took a different approach in *Dorsey*, 2021 IL 123010. The court concluded that we cannot determine whether a defendant's sentence constitutes a *de facto* life sentence without considering sentence credit. *Id.* ¶ 65. The court focused on a defendant's agency taking "a direct stake in maintaining good order and discipline while incarcerated." (Internal quotation marks omitted.) *Id.* ¶ 52. The court determined that a defendant would only serve their complete sentence if they failed to demonstrate the rehabilitative potential *Miller* contemplates. *Id.* ¶¶ 52-54. The court then rejected *Peacock*'s primary rationale, supported (we thought) by *Buffer*, finding it of "no moment" that the trial court has no control over good-conduct credit at the time it imposes sentence. *Id.* ¶ 56. Because defendants ostensibly have "power" to shorten their sentences by earning good-conduct credit (*id.* ¶ 54), the court reasoned, they have a sufficient "opportunity to demonstrate rehabilitation and obtain release before [they] spend[ ] more than 40 years in prison" (*id.* ¶ 61).

¶36 We must now set aside the wisdom and logic of *Peacock* to follow *Dorsey*, and doing so requires us to reject Hill's eighth amendment challenge to his sentence. Because Hill's original conviction predates truth-in-sentencing provisions in the Code of Corrections, he is eligible for day-for-day credit against his sentence. See, *e.g.*, 730 ILCS 5/3-6-3(a)(2) (West 1994). Assuming he receives all the credit he is entitled to, Hill will serve 26 years in prison—well below *Buffer*'s 40-year ceiling. Under *Dorsey*, Hill is not serving a *de facto* life sentence, and his sentence need not be *Miller*-compliant.

¶37 We next consider whether *Dorsey* signals the end to Hill's request for *Miller* relief under the proportionate penalties clause. After a recent decision of our court—*People v. Meneses*, 2022

14

IL App (1st) 191247-B—we ordered supplemental briefing from the parties on the following question: "Whether *People v. Dorsey*, 2021 IL 123010, applies to juvenile sentencing claims seeking to apply the principles of *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny under the proportionate penalties clause of the Illinois Constitution." We thank the parties for their supplemental briefs. We conclude *Dorsey* forecloses Hill's *Miller* claim under the Illinois Constitution as well.

¶38 Though we ultimately agree with the State regarding *Dorsey*'s affect on Hill's proportionate penalties clause claims for *Miller* relief, the State makes some preliminary arguments we find misplaced. First, the State argues Hill's proportionate penalties clause claim is forfeited because he did not raise it in the first round of briefing in this court or his postconviction petition. We disagree. The first two substantive paragraphs of Hill's opening brief argument were dedicated to the proportionate penalties clause and a traditional analysis of the excessiveness of his sentence. Then, after discussing *Miller* and the cases applying it, Hill again argued his sentence violated the proportionate penalties clause.

¶39 Hill's failure to mention the proportionate penalties clause in his postconviction petition is a red herring because the trial court granted postconviction relief on Hill's *Miller* claim and set the cause for resentencing. The relevant proceedings for purposes of forfeiture, therefore, are the resentencing proceedings, not the postconviction proceedings. And Hill raised the proportionate penalties clause as a section of his reply to the State's resentencing memorandum. Hill then restated his proportionate penalties clause argument in a paragraph in his motion to reconsider his new sentence. Accordingly, we reject the State's forfeiture argument as belied by the record and the original briefs filed in this court.

15

¶40    The State also argues that juvenile defendants are categorically foreclosed from invoking the proportionate penalties clause to seek *Miller* relief. The State asserts in its supplemental brief that "[i]t is beyond dispute that juvenile sentencing claims are properly analyzed under the eighth amendment and the safeguards provided by *Miller* and its progeny, rather than under the Illinois Constitution." The State cites no authority for this proposition, and it is misguided besides. Of course, as the State argues, we analyze young adults' *Miller* claims under the proportionate penalties clause. See, *e.g.*, *People v. Franklin*, 2020 IL App (1st) 171628. There is a simple reason: young adults cannot claim *Miller* protection under the eighth amendment. *Id.* ¶ 49 ("It is well established that offenders who are 18 years and older cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases."). That young adults are constrained to raise their *Miller* claims under the proportionate penalties clause does not constrain juvenile defendants to rely solely on the eighth amendment.

¶41    And the proportionate penalties clause may soon have heavier lifting to do for juvenile defendants facing life or *de facto* life sentences. Our supreme court has recently forecasted its willingness to follow the United States Supreme Court down the garden path of retracting juvenile sentencing protections under the eighth amendment. See *People v. Jones*, 2021 IL 126432, ¶¶ 16-17, 27 (citing with approval *Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307 (2021)). But it is, by now, axiomatic that the proportionate penalties clause provides greater protections than the eighth amendment. *E.g.*, *Franklin*, 2020 IL App (1st) 171628, ¶ 55. Should the United States Supreme Court or our supreme court or both continue to limit the now-robust protections juvenile defendants have under *Miller* and the eighth amendment, our courts will have to turn to the proportionate penalties clause for juvenile and young adult offenders alike.

¶42    Having cleared the underbrush, we turn to the merits and conclude that *Dorsey* forecloses Hill's *Miller* claim under the proportionate penalties clause. Whether raised under the eighth amendment or the proportionate penalties clause, a juvenile defendant must make the same threshold showing: his or her sentence is a life sentence or *de facto* life sentence. The constitutional source of the claim is irrelevant to this preliminary inquiry. Under *Dorsey*, Hill is not serving a *de facto* life sentence (*supra* ¶ 36), so neither the United States nor the Illinois Constitution has any work to do.

¶43    Hill relies heavily on our recent decision in *Meneses* as support for the claim that *Dorsey* has not set adrift juvenile offenders "seeking to apply *Miller*[ ] and its progeny under the Illinois proportionate penalties clause." We find *Meneses* was correctly decided for one key reason: the State failed to provide evidence of the actual time the defendant would serve on his sentence, and without that evidence, it would be impossible to hold that *Dorsey* applied. See *Meneses*, 2022 IL App (1st) 191247-B, ¶ 23. Notably, the defendant in *Meneses* was at the leave-to-file stage of a successive postconviction petition—a stage at which the State is not allowed to participate. See *People v. Lusby*, 2020 IL 124046, ¶ 29. So *Meneses* is of little value because we cannot predict the outcome once the State is able to respond to the defendant's claims. Here, we know Hill's projected release date (*supra* ¶ 36), and as a result, *Meneses* is distinguishable. Hill's *Miller* claim based on the proportionate penalties clause remains foreclosed.

¶44    Hill's original and supplemental briefing also raise a proportionate penalties clause claim unrelated to *Miller*. He argues his 54-year sentence for first degree murder is "excessive" in that it "shocks the moral sense of the community and undermines the objective of restoring offenders to useful citizenship." We did not have to reach this issue in our first opinion because the State's concession limited our inquiry to the threshold question addressed by *Peacock*. The Illinois

Supreme Court's decision in *Dorsey* requires us to reject Hill's *Miller* claims but does not foreclose traditional proportionality review. Undertaking that review now, we find the trial court abused its discretion by imposing a 54-year sentence for the completed murder offenses without adequately accounting for the deluge of expert testimony explaining Hill's diminished culpability and rehabilitative potential.

¶45    Our constitution requires "[a]ll penalties [to] be determined *both* according to the seriousness of the offense *and* with the objective of restoring the offender to useful citizenship." (Emphases added.) Ill. Const. 1970, art. I, § 11. Trial judges have wide discretion to set penalties within an applicable sentencing range though that discretion " 'is not unfettered.' " *People v. Haley*, 2011 IL App (1st) 093585, ¶¶ 63, 65 (quoting *People v. O'Neal*, 125 Ill. 2d 291, 297 (1988)). In line with the text of our constitution, trial judges must balance the goals of retribution and rehabilitation. *Id.* ¶ 63. "[P]roceed[ing] with great caution," as we must (internal quotation marks omitted) (*id.* ¶ 65), we find the trial court failed to adequately consider Dr. Cunningham's express connection between Hill's youth and his commission of the offense.

¶46    We base our conclusion on the stark juxtaposition between the trial court's resentencing findings and Dr. Cunningham's testimony. Dr. Cunningham repeatedly linked Hill's participation in the murder with his youth. For example, as a 15-year-old, Hill's behavior would have been characterized by impulsivity and co-participation—even more so for Hill because of the unique neurodevelopmental factors that further reduced his functional age at the time of the offense. Hill constantly dealt with negative influences and traumatic experiences without the family structure to insulate him. Dr. Cunningham also emphasized, referring to Hill's rehabilitative prospects, that his 15-year-old behavior was not at all predictive of future criminality in the way it would have been had he committed a murder as a fully developed adult.

¶47 In the face of these findings, the trial court described 15-year-old Hill as a "monster" based mostly, it seems, on a passing reference during Dr. Cunningham's cross-examination that Hill's criminal behavior was not inevitable even considering his unique circumstances. We acknowledge, of course, that the trial court explained it would no longer consider Hill a monster based on the rehabilitative strides Hill made while incarcerated. We find, however, that the trial court did not give the evidence of Hill's rehabilitation sufficient consideration given Dr. Cunningham's testimony that Hill's juvenile behavior had virtually no predictive value on his likelihood to re-offend as an adult. Dr. Cunningham's testimony shows that Hill's present-day behavior—"exemplary," as the trial court described it—is far more indicative of who he is as a person than the "monst[rous]" act he committed as a young, impressionable teen.

¶48 We conclude by commenting on the parties' dispute in their supplemental briefs on the value of deterrence in juvenile sentencing. The trial court found Hill's 54-year sentence necessary, in part, "to deter others from committing the same offense." Deterrence is a proper sentencing consideration, indeed one of the four pillars of criminal sentencing. *E.g.*, *People v. Jackson*, 2012 IL App (1st) 100398, ¶ 15 (purpose of sentencing includes retribution, rehabilitation, incapacitation, and deterrence). The trial court focused on general deterrence as opposed to specific deterrence. See Black's Law Dictionary (11th ed. 2019) (defining "general deterrence" as "[a] goal *** of a specific conviction and sentence, to discourage people from committing crimes," versus "specific deterrence" as "[a] goal of a specific conviction and sentence to dissuade the offender from committing crimes in the future"). We find deterrence an inapt consideration after reviewing Dr. Cunningham's testimony. Because Hill's 15-year-old behavior was based primarily on the impetuousness of youth, not considered adult decision-making, we fail to see how a lengthy

19

sentence would deter similarly situated juveniles or adults capable of higher-order cost-benefit analyses of their decisions.

¶49 We emphasize we do not fault the trial court's consideration of the egregious nature of Hill's offense. He was convicted as the shooter and took two lives. The narrow question is whether the trial court adequately considered Dr. Cunningham's extensive testimony explaining Hill's criminal conduct, not excusing it. Dr. Cunningham's testimony provides two primary lessons: (i) Hill's uniquely underdeveloped rational thinking skills coupled with his desire to go along with older peers explained his criminality, and (ii) Hill's demonstrated rehabilitation as an adult confirms his youthful susceptibility to the negative influences around him. Taking these lessons, we find the trial court abused its discretion in minimizing the effects of Hill's youth on his participation in these murders and his demonstrated ability to conform his conduct to the law as an adult.

¶50 Hill argues we should exercise our authority under Illinois Supreme Court Rule 615 to reduce his sentence ourselves. We decline for two reasons. First, Hill does not offer a sentence he thinks would be appropriate in place of his 54-year sentence for first degree murder. Second, our decision is not based on the substantive unreasonableness of Hill's new sentence; instead, we base our decision on the trial court's failure to adequately consider the extensive evidence offered by Dr. Cunningham. We think the trial court should have the opportunity to reweigh Hill's sentence in the first instance in a manner not inconsistent with this opinion. We express no opinion on Hill's consecutive six-year sentence for attempted first degree murder.

¶51 Reversed and remanded.

20

**No. 1-17-1739**

| | |
|---|---|
| **Cite as:** | *People v. Hill*, 2022 IL App (1st) 171739-B |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 95-CR-6668(01); the Hon. Dennis J. Porter, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David Iskowich, and Koula A. Fournier, Assistant State's Attorneys, of counsel), for the People. |