NOTICE
Decision filed 08/19/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 231328-U

NO. 5-23-1328

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 22-CF-49 |
| | ) | |
| JATREVIUS O. JARRETT, | ) | Honorable |
| | ) | Thomas E. Griffith, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's 50-year sentence is affirmed, where the trial court did not sentence the defendant to a *de facto* life sentence and did not impose an excessive sentence.

¶ 2    The defendant, Jatrevius O. Jarrett, was convicted of first degree murder. See 720 ILCS 5/9-1 (West 2020). The trial court sentenced the defendant to a prison term of 25 years plus a 25-year firearm enhancement (see 730 ILCS 5/5-8-1(d)(iii) (West 2022)), for a total of 50 years. The defendant appeals, challenging his sentence. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    We present only those facts which are necessary for the disposition of this appeal. On January 14, 2021, the State filed a three-count indictment charging the defendant with first degree

1

murder for the December 24, 2021, shooting death of Eferm O. Jones. See 720 ILCS 5/9-1 (West 2020).

¶ 5    On April 4, 2023, the defendant signed a written jury waiver form, which was tendered to the trial court that same day. After duly admonishing the defendant, the court accepted the defendant's waiver form and ruled that he knowingly and voluntarily waived his right to a jury trial. The defendant's bench trial began on August 15, 2023, and a summary of the evidence heard by the trial court follows.

¶ 6    On December 24, 2021, the Decatur Police Department received a call reporting a shooting at an apartment complex located on South Church Street. Upon arrival, law enforcement officers found Jones deceased in the parking lot. An autopsy was conducted by a forensic pathologist, who testified that Jones died from six gunshot wounds.

¶ 7    Through the course of an investigation conducted by Ben Massey, a detective for the Decatur Police Department, it was discovered that Jones operated a photography business where he took pictures of families at his apartment. On the day of Jones's death, the defendant's mother[1] had driven the defendant, his girlfriend, and their newborn baby to Jones's apartment for a photo session. During the photo session, the defendant's mother remained in her vehicle, which was parked in the complex parking lot. Additionally, a group of women began gathering in the same parking lot. After the photo session, Jones escorted the defendant, his girlfriend, and their newborn baby out of his apartment. As the defendant walked toward his mother's vehicle, the group of women sprayed him with mace. Shortly afterward, a vehicle arrived, and a group of men exited the vehicle and "jumped" the defendant.

---

[1]The defendant's mother was a codefendant in this case. However, she is not a party to this appeal.

¶ 8    Around the same time, Earlintha Osbey's vehicle was parked in the complex's parking lot, where her friend Africa Biggs and Biggs's boyfriend, Cortez Ford, resided. Osbey called Biggs, and the two sat in her vehicle and smoked marijuana. While smoking marijuana, Osbey and Biggs observed the group of women spray the defendant with mace. Biggs and Osbey then "jumped out of the car and started recording." Shortly after the group of men left, Biggs went to her apartment, where she grabbed a jug of milk and informed Ford about the altercations involving the defendant. Ford recognized the defendant as the nephew of Marquis Graves, who later received a phone call informing him of the altercations.

¶ 9    Biggs then returned to the complex parking lot, where she poured milk on the defendant's face to help alleviate the effects of the mace. However, according to Biggs's trial testimony, the milk was "not working" because it had spoiled. As a result, Biggs allowed the defendant to come into her apartment for further assistance. Eventually, the defendant left the complex in his mother's vehicle. Shortly thereafter, Osbey, Biggs, and Ford left the complex in Osbey's vehicle and picked up Graves and his friend Dean.[2]

¶ 10    After the defendant, Osbey, Biggs, and Ford had left, surveillance footage presented at trial showed Jones leaving the complex and returning approximately nine minutes later. Additionally, footage showed the defendant's mother's vehicle returning to the complex. During an interview with Massey, the defendant admitted that he returned to the complex because he was upset that someone had beaten him up. Further, footage showed Ford, Graves, and Dean exiting Osbey's vehicle prior to it parking in a lot west of the complex.

---

[2]The record in this case does not provide a last name for Dean. Therefore, we refer to him by his first name.

¶ 11    Multiple witnesses at trial testified that the defendant exited the passenger side of his mother's vehicle and met with Graves and Dean in the complex parking lot. While in the complex parking lot, Graves and Dean confronted Jones shortly after Jones returned to the complex. During this confrontation, Graves accused Jones of setting the defendant up. The defendant stood behind Graves and had one of his hands inside a small backpack. At some point, the defendant pushed Graves aside, removed a gun from the backpack, and shot Jones multiple times. Ford testified he observed the defendant shoot Jones from "probably ten yards" away. After shooting Jones, the defendant returned to his mother's vehicle, which then fled the scene. Ford, Graves, and Dean then returned to Osbey's vehicle, which then also fled. At the time of the shooting, the defendant was 18 years old.

¶ 12    After hearing all of the evidence and closing arguments, the trial court found the defendant guilty as to all three counts of first degree murder. In addition, the trial court found that the defendant, committing first degree murder, had personally discharged a firearm. The defendant's sentencing hearing was set for November 8, 2023.

¶ 13    On October 31, 2023, a presentence investigation report (PSI) was filed with the court. According to the report, the defendant was born in Decatur, Illinois, on July 13, 2003, to parents Kion Cliff and Jacobe Jarrett, who were never married. The defendant was raised by his mother and his three sisters. The defendant reported that he had a good relationship with his parents and siblings, though his father passed away in 2021. Additionally, he was reportedly in a relationship with Destiny Harris, and they shared one minor child.

¶ 14    The defendant reported being physically healthy. However, the defendant reportedly began using cannabis at the age of 13, developing a daily habit leading up to his arrest for the offense of first degree murder. At the time of the defendant's arrest, he was enrolled in the William Harris

4

Alternate Learning Academy's virtual program for the 2020-21 school year. The defendant began attending Old King's Orchard Community Center in November of 2020 to aid with the virtual classes. The defendant successfully completed one semester and planned to graduate in May of 2022. Although arrested, the defendant reportedly still hoped to earn a high school diploma. The defendant reported no known learning disabilities.

¶ 15    Emotionally, the defendant described himself as healthy and reported no history of mental health diagnoses. However, the PSI took note of the defendant's probation records, which indicated that the defendant was involved with Heritage Behavioral Health Center (Heritage) during his juvenile probation from 2020 to 2021. During this time, the defendant participated in the Community Access[3] program (Program) and was diagnosed with "Unspecified Disruptive, Impulse-Control, and Conduct Disorder and Cannabis Use Disorder." The defendant's juvenile convictions listed in the PSI included, *inter alia*, unlawful possession of a handgun under 18 and aggravated domestic battery.

¶ 16    On November 8, 2023, the defendant's sentencing hearing took place. At the beginning of the defendant's sentencing hearing, the trial court expressly noted that all counts merged into count I, "being the intentional count." The trial court also noted that it found the defendant had personally discharged a firearm, "which means there is a 25-year add-on provision." See 730 ILCS 5/5-8-1(d)(iii) (West 2022). Consequently, the trial court determined that the defendant's possible minimum sentence would be 45 years. Additionally, the trial court confirmed with defense counsel that counsel intended to make an as-applied constitutional challenge. Defense counsel indicated

---

[3]The Program was also identified in the record as Redeploy Illinois. Redeploy Illinois provides services for youth who are at a high risk of commitment to the Department of Juvenile Justice.

that the challenge would essentially be a request for the trial court to deviate from the defendant's possible minimum sentence of 45 years.

¶ 17    In aggravation, the State requested the trial court "to take notice of the [PSI], specifically, the criminal background" section. In mitigation, the defense first proffered an article entitled "White Paper on the Science of Late Adolescences" (White Paper), published by the Center for Law, Brain & Behavior at Massachusetts General Hospital. Center for Law Brain & Behavior at Massachusetts General Hospital, White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers (Jan. 27, 2022). https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/ (last accessed July 24, 2025). The White Paper reviewed recent scientific research establishing that most late adolescents who chronically commit crime in youth do not persist in adulthood. *Id.* at 44.

¶ 18    Next, the defense proffered an assessment summary from the defendant's time at Heritage, along with his counseling records from the Program. The defense noted that both the summary and the records, along with the PSI, indicated that the defendant had been diagnosed with "unspecified disruptive disorder, impulse control disorder, conduct disorder, and cannabis abuse or cannabis use disorder." The defense argued that the defendant's diagnoses were "significant and related to the theory of emerging adults as opposed to the minor in this case."

¶ 19    Tish Cliff, the defendant's maternal grandmother, then testified in mitigation. Cliff testified that prior to December of 2021, the defendant took care of her and helped her with tasks around her home. Cliff testified that she and the defendant shared a "good bond" because the defendant respected her. Cliff described the defendant as a "homebody," testifying that his activities prior to December of 2021 included playing video games or watching movies with his girlfriend. Further,

Cliff testified that the defendant "wasn't no street runner," and did not like being around trouble. The defendant did not make a statement in allocution.

¶ 20    Before making its recommendation, the State argued that following *People v. Harris*, 2018 IL 121932, the burden was on the defendant to put forth "substantial evidence showing that this defendant does not have the same type of *** brain as an average adult." The State then recommended a sentence of 60 years, explaining that the sentencing range in this case was "very wide." To support its recommendation, the State urged the trial court to consider the statutory factors, and the PSI, specifically the defendant's criminal record.

¶ 21    In response, the defense argued the trial court should "look past the *** arbitrary distinction of a minor at 17 years old versus an adult" because case law requires the court to consider "what's going on with" the defendant, who is an emerging adult. The defense emphasized that the defendant faced "basically a life sentence," which is prohibited by the Illinois Constitution. The following colloquy then occurred:

"[THE COURT]: [Defense counsel], how about [the State's] argument that in order to grant an as applied constitutional challenge there would be specific testing done on the defendant's brain to see if he falls in that category, which is not how I read the *Harris* case, but—

[DEFENSE COUNSEL]: I didn't see it that way either, but I believe, even if that's what or, basically, what [the State] wants you've got it in the diagnosis and medical reports from Heritage.

* * *

[THE STATE]: I think you might have misunderstood my argument.

[THE COURT]: Okay. Maybe I did.

7

[THE STATE]: I think what *Harris* said, I'm just gonna read off my notes. So, I think I write better than I speak sometimes. Here's what I wrote down. In *Harris* the Illinois Supreme Court characterized the constitutional argument as a 'as applied' challenge for that specific defendant. The Supreme Court went on to say there was not any evidence in the record at the trial court level showing that the defendant's brain was mature or immature compared to an 'average' adult brain. So, the Supreme Court put the burden on the defense for this issue.

If the defense claims the defendant was not mature at the time of the crime then, they need evidence, some kind of expert or alternatively some kind of clear evidence showing that for this particular defendant their brain was not developed fully equals operating at a lower level of maturity than your average adult.

If the defense does not present any evidence that the defendant's brain is less mature than an average adult, then the trial court is required to treat the defendant as an average adult."

¶ 22    In response, the defense argued[4] that *Harris* took the propositions set forth in *Miller v. Alabama*, 567 U.S. 460 (2012), and logically concluded "that even if a person is not a juvenile we would have to recognize, based on scientific evidence that a person is not completely an adult, even at the age of 18 or 19." The defense then argued the defendant had rehabilitative potential. The defense emphasized the defendant's home environment, describing it as stable. Additionally, the defense emphasized the defendant's mental health diagnoses and issues with substance abuse,

---

[4]Additionally, the defense filed a memorandum of law outlining the mitigating factors relevant to the defendant as an emerging adult. In the memorandum, the defense argued that the defendant's potential for rehabilitation, his family environment, his mental health and substance abuse issues should be considered when determining his sentence.

claiming the defendant had experienced delayed development. To support this claim, the defense mentioned the defendant was held back two years in school. The defense then urged the trial court to "embrace the developing law, the developing theory of the emerging adult and being able to take things into mitigation," and asked for the defendant to be sentenced to less than 45 years.

¶ 23    Upon hearing the recommendations from both the defense and the State, the trial court sentenced the defendant to 25 years imprisonment as to first degree murder (see 720 ILCS 5/9-1 (West 2020)) and 25 years' imprisonment pursuant to the firearm sentencing enhancement (see 730 ILCS 5/5-8-1(d)(iii) (West 2022)), to be followed by 3 years of mandatory supervised release. In determining the defendant's sentence, the trial court explained that it considered the PSI, along with "all the facts, the factors in aggravation and mitigation, the other evidence, the defendant's age and so on." Additionally, the trial court rejected the defendant's as-applied challenge under the proportionate penalties clause. In doing so, the court explained that case law established a "bright line rule" indicating that once a defendant has reached the age of 18, the court is not required to consider the sentencing factors relevant to juveniles.

¶ 24    At the conclusion of the defendant's sentencing hearing, the defense filed a motion to reconsider sentence. In the motion to reconsider, the defense argued the defendant's sentence was "excessive, as the sentence is a de facto life sentence, which is inconsistent with *Alabama v. Miller*, the Illinois Constitution, and the potential rehabilitation of the [d]efendant." The trial court denied the motion on December 7, 2023, and this appeal followed. Additional facts will be provided in the analysis, if necessary.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, the defendant raises the following issues: (1) whether the 50-year sentence imposed on the defendant, who was 18 years old, violates the proportionate penalties clause of the

9

Illinois Constitution; and (2) whether the 50-year sentence imposed on the defendant, who was 18 years old at the time of the offense, is excessive. For the reasons that follow, we affirm.

¶ 27                              A. *Proportionate Penalties*

¶ 28    The defendant argues that his 50-year sentence violates the proportionate penalties clause of the Illinois Constitution as applied to him because he was 18 years old at the time of the offense.

¶ 29                          1. The Eighth Amendment and *Miller*

¶ 30    Although the defendant did not bring a claim under the eighth amendment, we begin our analysis by reviewing eighth amendment jurisprudence, particularly the United States Court decision in *Miller v. Alabama*, 567 U.S. 460 (2012). We find this review essential for explaining the defendant's proportionate penalties clause claim.

¶ 31    The eighth amendment of the United States Constitution prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. The eighth amendment's prohibition of cruel and unusual punishment " 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller*, 567 U.S. at 469 (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)).

¶ 32    Beginning in 2005, the United States Supreme Court issued a series of decisions acknowledging that offenders under the age of 18 "are constitutionally different from adults for purposes of sentencing" with respect to the eighth amendment of the United States Constitution. *Id.* at 471. In *Roper*, the Court held the eighth amendment prohibits the imposition of the death penalty on juvenile offenders. *Roper*, 543 U.S. at 568. Subsequently, in *Graham v. Florida*, 560 U.S. 48 (2010), the Court similarly held the eighth amendment prohibits a juvenile from being sentenced to life without parole for nonhomicide offenses. *Id.* at 74.

¶ 33    Relying on the reasoning established in *Roper* and *Graham*, the Court found in *Miller v. Alabama* that a mandatory life sentence without the possibility for parole for offenders under 18

years old, even in homicide cases, "violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller*, 567 U.S. at 465. However, the Court determined that a sentencing court could impose a life sentence without parole on a juvenile only if, prior to sentencing, the court considers various factors relevant to youth and its attendant circumstances, including (1) the defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the defendant's "family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) the circumstances of the offense, "including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "incompetencies associated with youth"; and (5) "the possibility of rehabilitation." *Id.* at 477-78. Notably, the Illinois Supreme Court has affirmed 18 years as the age cutoff for *Miller* sentencing protections in the context of the eighth amendment. See *Harris*, 2018 IL 121932, ¶¶ 54-61.

¶ 34    Coextensive with the eighth amendment (see U.S. Const., amend. VIII) is the proportionate penalties clause of the Illinois Constitution (see Ill. Const. 1970, art. I, § 11). See also *People v. Patterson*, 2014 IL 115102, ¶ 106. The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The proportionate penalties clause prohibits, *inter alia*, criminal penalties that are "cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." (Internal quotation marks omitted.) *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). Despite our supreme court's ruling in *Harris*, it has left open the possibility of a young offender, such as the defendant

11

in this case, to rely upon *Miller* to support an as-applied constitutional challenge to a *de facto* sentence under the proportionate penalties clause. See *Harris*, 2018 IL 121932, ¶¶ 46-48.

¶ 35    In this case, the parties concede in their briefs that the defendant's proportionate penalties challenge is an as-applied constitutional challenge. An as-applied constitutional challenge requires a showing that the sentencing statute violates the constitution as it applies to the facts and circumstances of the challenging party. *Id.* ¶ 39. Because all as-applied challenges are, by definition, dependent on the specific facts and circumstances of the defendant raising the challenge, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for appellate review." (Internal quotation marks omitted.) *Id.*

¶ 36    On appeal, the defendant argues that the record in this case is sufficiently developed to address his proportionate penalties challenge. The defendant contends that defense counsel raised an as-applied challenge to his sentence under the proportionate penalties clause during his sentencing hearing. Additionally, the defendant argues that counsel proffered the White Paper, which "includes significant research on the brain development of emerging adults ages 18-21" and "extends much of the science that resonated with the *Miller* court." Further, the defendant claims that the record includes the PSI and "extensive medical records from [his] recent juvenile probation which illustrate [his] particularly difficult circumstances, mental health struggles, and educational delays." Alternatively, the defendant argues that if the record is insufficient, defense counsel was ineffective for failing to develop the record for appellate review.

¶ 37    We first address the defendant's as-applied challenge under the proportionate penalties clause of the Illinois Constitution. The defendant argues[5] that his 50-year sentence violates the

---

[5]Intertwined with the defendant's as-applied challenge is an argument of plain error. However, the defendant does not argue plain error under either prong. Accordingly, we find the defendant's argument forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); see also *People v. Hillier*, 237 Ill. 2d 539, 546 (2010).

proportionate penalties clause because it is a *de facto* life sentence that "does not reflect his potential for rehabilitation or the evolving understanding of the brain development of emerging adults."

¶ 38    The defendant's proportionate penalties challenge is based upon *Miller*. Indeed, *Miller* applies to both a sentence of life without parole and a "term of years that is the functional equivalent of life without the possibility of parole." See *People v. Reyes*, 2016 IL 119271, ¶ 9. A term of years that is the functional equivalent of life without parole, otherwise known as a *de facto* life sentence, is more than 40 years. See *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41. Therefore, the threshold inquiry for the defendant is whether a life sentence, *de facto* or otherwise, was imposed. See *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 68; see also *People v. Hill*, 2022 IL App (1st) 171739-B, ¶ 42.

¶ 39    We note that, because of the *Miller* decision, the Illinois legislature enacted section 5-4.5-105 of the Unified Code of Corrections (Code) (see 730 ILCS 5/5-4.5-105 (eff. Jan 1, 2016)), which imposed a new sentencing scheme for defendants who were under 18 years of age when they committed their offense. Under section 5-4.5-105(a) of the Code, a sentencing court is required to consider "additional factors in mitigation in determining the appropriate sentence." *Id.* § 5-4.5-105(a). These additional factors are "consistent with *Miller*'s discussion of a juvenile defendant's youth and its attendant characteristics." *Buffer*, 2019 IL 122327, ¶ 36.

¶ 40    Subsequently, the Illinois legislature enacted section 5-4.5-115 of the Code to address "youthful offenders under the age of 21." *People v. Green*, 2022 IL App (1st) 200749, ¶ 41. Section 5-4.5-115 of the Code (see 730 ILCS 5/5-4.5-115 (eff. June 1, 2019)) created parole review for offenders under the age of 21 at the time of their offense. See *id.* § 5-4.5-115(b). Specifically,

a defendant convicted of first degree murder may be eligible for parole after serving 20 years if they were under 21 at the time of the offense. *Id.* In determining if a defendant should be granted parole, the Prisoner Review Board panel is required to "consider the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration." *Id.* § 5-4.5-115(j).

¶ 41 In this case, the defendant's crime subjected him to a prison term of 20 to 60 years for first degree murder (see 720 ILCS 5/9-1 (West 2020)) plus a mandatory firearm enhancement of 25 years (see 730 ILCS 5/5-8-1(d)(iii) (West 2022)). Thus, the statutory scheme under which the defendant was sentenced required a minimum possible sentence of 45 years. However, the defendant was 18 years old at the time of the offense. Because the defendant was 18 years old at the time of the offense, he is eligible for parole under section 5-4.5-115 of the Code. See *id.* § 5-4.5-115(b). In other words, the defendant was, therefore, sentenced under a statutory scheme that makes him eligible for parole before he serves more than 40 years in prison.

¶ 42 On appeal, the defendant cites to *People v. Gates*, 2023 IL App (1st) 211422, for support of his argument that his sentence is a *de facto* life sentence. In *Gates*, the appellate court held the possibility of parole did not preclude the defendant, who was eligible for parole under section 5-4.5-115 of the Code, from serving a *de facto* life sentence. *Id.* ¶ 73. However, after briefing was completed in this case, our supreme court issued its decision in *People v. Spencer*, 2025 IL 130015. In S*pencer*, our supreme court held where a defendant is eligible for parole after 20 years under section 5-4.5-115 of the Code, there is no *de facto* life sentence. *Id.* ¶ 34. In so holding, our supreme court expressly overruled the appellate court decisions in, *inter alia*, *Gates*, to the extent that that *Gates* "can be interpreted to hold that sentences over 40 years are *de facto* life sentences despite the defendant's eligibility for parole." *Id.* ¶ 40.

14

¶ 43 Based upon *Spencer*, we must conclude in this case that the defendant was not subject to a *de facto* life sentence where he is eligible for parole under section 5-4.5-115 of the Code. See *id.* ¶ 34. Accordingly, the defendant's proportionate penalties clause challenge is without merit. See *Cavazos*, 2023 IL App (2d) 220066, ¶¶ 60, 64 (where there is no *de facto* life sentence, there is no violation of the proportionate penalties clause). In view of our conclusion, we need not address the defendant's remaining claims as to this issue. See, *e.g.*, *People v. West*, 187 Ill. 2d 418, 448 (1999).

¶ 44                                              B. *Sentencing*

¶ 45 Next, the defendant argues that his 50-year sentence is excessive considering the mitigating evidence presented to the trial court. The defendant requests this court to either reduce his sentence or remand his case for a new sentencing hearing.

¶ 46 Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) grants this courts the power to reduce an excessive sentence. *People v. Steffens*, 131 Ill. App. 3d 141, 151 (1985). However, "[i]t is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). An abuse of discretion will be found only where the sentencing court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Hall*, 195 Ill. 2d 1, 20 (2000). We are to grant such deference because the sentencing court "is in the best position to 'analyze the acts constituting the crime and a defendant's credibility, demeanor, general moral character, mentality, social environments, habits, age, and potential for rehabilitation.' " *People v. Tijerina*, 381 Ill. App. 3d 1024, 1039 (2008) (quoting *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004)). Thus, a reviewing court may not overturn a

sentence merely because it might have weighed the pertinent factors differently. *People v. McGowan*, 2013 IL App (2d) 111083, ¶ 10.

¶ 47    Further, Illinois courts recognize that sentences within the statutory range are presumed to be proper. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). When a sentence imposed falls within the statutorily prescribed range, it will not be found to be excessive or an abuse of discretion unless the sentence greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 33. In other words, an abuse of discretion may be found, even if the sentence is within the statutory range, if it is contrary to the purpose and spirit of the law. *Id.* The spirit and purpose of the law are promoted when the trial court's sentence gives sufficient consideration to both the seriousness of the offense and the defendant's rehabilitative potential. *Boclair*, 225 Ill. App. 3d at 335.

¶ 48    While the trial court must consider the defendant's rehabilitative potential, it is not required to accept the contention that a defendant has rehabilitative potential. See *id.* at 498. Additionally, the trial court is not required to give a defendant's rehabilitative potential greater weight than other pertinent factors. See *People v. Alexander*, 239 Ill. 2d 205, 214 (2010). We presume that the trial court considered all mitigating factors, absent some contrary evidence. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 29. Thus, the defendant bears the burden to affirmatively establish that the sentence was based on improper considerations, and we will not reverse a sentence imposed by a trial court unless it is clearly evident the sentence was improper. *Id.*

¶ 49    On appeal, the defendant acknowledges that his sentence is within the statutory prescribed range. Therefore, he is essentially alleging that the trial court abused its discretion by imposing a sentence that is only five years above the statutory minimum because it failed to consider his capability for rehabilitation. Specifically, the defendant argues that the trial court did not

16

adequately consider his personal history, mental health diagnoses, educational delays, and "the fact that he was acting under strong provocation in committing the offense." The defendant emphasizes that he was "barely 18 years old at the time of the offense," and argues that his "youth alone serves as strong evidence of his rehabilitative potential."

¶ 50    The record reveals that during sentencing, the trial court considered various mitigating factors, including the defendant's age. The trial court noted that it had "no doubt the defendant was not fully mature" at the time of the offense, as he was "about 18 years old and 5 months at the time." The trial court then acknowledged the seriousness of first degree murder by stating that it had considered the offense of first degree murder "to be the most serious offense." The trial court emphasized that Jones "died senselessly, just for no reason whatsoever," indicating Jones had gone out to run some type of errand and upon coming back he *** [was] just murdered senselessly."

¶ 51    Additionally, the record reveals that during sentencing, the trial court also considered the defendant's personal history, his mental health diagnoses, educational delays, and "the fact that [he] was acting under strong provocation at the time of the offense." However, the trial court indicated the only evidence it found to "be pertinent" was that "the defendant was in some alternative classes, but there was no indication of any type of special education classes. He did not graduate from high school because he was arrested for this offense before he had that opportunity." The trial court then indicated the defendant was employed but noted the defendant "did use cannabis on a daily basis." The trial court referenced the defendant's Program records, noting he was engaged in counseling and had been diagnosed with "some type of impulse control disorder." Additionally, regarding provocation, the record shows the trial court considered whether the defendant was acting under serious provocation and determined that the defendant's actions did not amount to strong provocation.

17

¶ 52    The defendant's argument is not that the trial court failed to consider the sentencing factors, but essentially that it did not give appropriate weight to the factors. It is not our role to reweigh the pertinent factors and substitute our judgment for that of the trial court. To reiterate, we may not overturn a sentence merely because we might have weighed the pertinent factors differently. *McGowan*, 2013 IL App (2d) 111083, ¶ 10. Under these circumstances and based on the seriousness of the offense, we cannot say the defendant's 50-year sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." See *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). Further, the defendant's eligibility for parole review in 20 years further mitigates against finding his sentence excessive. See *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 59 (in determining if a sentence is excessive, the reviewing court may consider the defendant's eligibility for parole). Accordingly, we hold the trial court did not abuse its discretion in imposing a 50-year sentence.

¶ 53                          III. CONCLUSION

¶ 54    Therefore, we affirm the judgment of the circuit court of Macon County.


¶ 55    Affirmed.