2023 IL App (1st) 211420-U

THIRD DIVISION
February 8, 2023

No. 1-21-1420

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit Court of |
| | ) Cook County. |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) No. 16 CR 16097 |
| | ) |
| GUILLERMO ROMERO, | ) |
| | ) Honorable Thomas Joseph Hennelly, |
| Defendant-Appellant. | ) Judge, presiding. |

JUSTICE DEBRA B. WALKER delivered the judgment of the court.
Presiding Justice McBride and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant's sentence is not an unconstitutional *de facto* life sentence, it does not violate the proportionate penalties clause of the Illinois constitution, and it is not excessive. One of defendant's murder convictions must be vacated pursuant to the one act, one crime rule. Affirmed as modified.

¶ 2    Following a jury trial, defendant Guillermo Romero was convicted of two counts of first-degree murder in connection with the shooting death of Tonriche[1] Weathersby, Jr. The trial court sentenced defendant to 64½ years' imprisonment, comprising a 39½-year sentence for the murder

---

[1] The victim's name in the record is also spelled "Tonrichie" and "Tonthrichie."

and a 25-year add-on for having discharged a firearm that proximately caused the victim's death. On appeal, defendant contends that his sentence is (1) an unconstitutional *de facto* life sentence pursuant to both the eighth amendment of the federal constitution and the proportionate penalties clause of the state constitution or (2) otherwise excessive. Defendant further contends that his mittimus must be corrected to reflect only one murder conviction. We affirm as modified.

¶ 3                                          BACKGROUND

¶ 4      The State charged defendant with six counts of first-degree murder in connection with the shooting death of Tonriche Weathersby, Jr. On June 10, 2019, however, the trial court entered an order indicating that the State nol-prossed counts I through IV. Counts V and VI both alleged that defendant shot and killed the victim while armed with a firearm. Whereas count V alleged that defendant committed the offense "intentionally or knowingly," count VI alleged that defendant committed the offense "knowing that such act created a strong probability of death ***."

¶ 5      Defendant does not contest the sufficiency of the evidence. We will therefore limit our discussion of the evidence adduced at trial. Daniel Smith testified that, on September 17, 2016, he was a "party promoter," and he—along with an individual he knew as "Mickeyfoo"—actively promoted a party in the area of West 58th Street and South Maplewood Avenue in Chicago. Daniel added that for this party, he included the notice, "No weapons. Security will do pat-downs."

¶ 6      Daniel then stated that, just before midnight at the time of the party, he heard a bottle break in the living room area. Daniel went there and saw the victim and the victim's brother fighting with "four other Mexicans," including defendant. Daniel said the fight was a "fistfight" initially and the fight ended in a bedroom. At that point, Daniel saw an individual pull out a gun, "aim it with two hands," and shoot the victim in the chest. Daniel saw the gun fire and heard "two to three" shots. Daniel heard the victim tell his brother that he had been shot before collapsing.

2

Defendant then ran out the front door. Daniel identified defendant in-court as the shooter and stated that he was three or four feet from defendant at the time of the shooting. Daniel then left the area but later returned to speak to police. A few days after the shooting, Daniel identified defendant in a photo array as the person who shot and killed the victim.

¶ 7 Mikiel Smith then testified that, at the time of the shooting, he worked as a party promoter and was also known by the nickname "Mickeyfoo." Mikiel stated that he promoted a party at a house in the area of 58th and Maplewood on September 17, 2016. Mikiel saw an individual named Alexsander [*sic*] Ramirez come to the party with three other males, including defendant, whom Mikiel identified in court. At around midnight, Mikiel was outside of the house at the bottom of the porch and heard some women complaining that there was a fight. Mikiel started to go into the house but heard two gunshots come from inside of the house, so he immediately left the porch area to allow partygoers to leave. Once the entrance was clear, Mikiel ran in and saw the victim, whom he did not know, lying on the floor unresponsive. Mikiel later spoke to police and subsequently identified defendant in a photo array as one of the partygoers.

¶ 8 Darrius Richardson testified that he was the victim's brother and went with him to the house party at 5840 South Maplewood Avenue on September 17, 2016. Richardson said that, at around midnight, he saw his brother get struck with a beer bottle. Richardson noted that neither he nor his brother were "having problems with" anyone at the party and that neither of them were armed. Richardson could not see who struck his brother with the bottle and added that he did not recall anyone saying something before then. After the bottle broke over his brother's head, a fight broke out and he rushed over to defend his brother and then himself against four to five Hispanic males. Richardson said someone then pushed him from behind, and he fell. When Richardson got back up, he saw defendant aim a gun at his brother and then shoot. Richardson was about ten feet

3

from the shooter and identified defendant in court as the person who shot his brother. Richardson confirmed that there was no verbal exchange between defendant and his brother or him before the shooting, and defendant said nothing immediately after the shooting. Richardson recalled that his brother told him that he was shot and then collapsed as Richardson tried to carry him to the car. Richardson did not see where defendant went after the shooting. Richardson spoke to police when they arrived and subsequently identified defendant in a photo array.

¶ 9    Evidence technicians found two spent cartridge casings that were later found to have been fired from the same gun. The State then rested, and defendant elected not to present any evidence.

¶ 10    Following closing arguments and deliberations, the jury found defendant guilty of first-degree murder. The jury further found that defendant personally discharged a firearm that proximately caused the victim's death. The trial court entered judgment on the convictions and continued the matter for sentencing.

¶ 11    On February 27, 2020, defendant's sentencing hearing began. The court acknowledged receipt of defendant's presentence investigation report (PSI), which was dated July 11, 2019. The PSI indicated that defendant described his childhood as "normal," where all of his needs were met, and that he was not neglected. Defendant further stated that he was raised by his mother and had a good relationship with her and his two older sisters, but that he did not have any kind of relationship with his father, who was then living in Mexico. Defendant further stated that he dropped out of high school before finishing his freshman year because he did not like school, but he denied using alcohol at any time. Defendant, however, admitted that he had an "active affiliation" with the "Two-Six" street gang. In addition, defendant declined to provide his version of the offense and did not complain that he was unable to waive his right to a jury trial.

¶ 12     After defense counsel noted various corrections to the PSI, the State informed the court that its witnesses were unavailable at that time, so the court allowed Dr. Joan Leska to testify first on behalf of the defense as an expert in the field of forensic psychology.  Dr. Leska testified that she had been a clinical psychologist for 28 years and that she had evaluated defendant for "mitigation" and wrote a report detailing her evaluation that was dated February 3, 2020.

¶ 13     Dr. Leska stated that she met with defendant three times for a total of 8½ hours, reviewed his arrest records, as well as two pending criminal cases that arose after his murder conviction while he was incarcerated.  Dr. Leska administered various tests, including a general intelligence test, a personality assessment inventory, and a traumatic stress inventory.  Dr. Leska also spoke with defendant's older half-sister, Jennifer Aguilar, and his paternal aunt, Adele Barrera.

¶ 14     Dr. Leska testified that defendant had a sixth-grade reading ability and his IQ score was between 70 and 79, which she stated would place defendant in the "borderline" range.  Dr. Leska noted, however, that defendant's "innate intelligence" was probably higher that what the test indicated because he had "very little *** formal education."   Defendant's results from his "Personality Assessment Inventory" test suggested that defendant's profile was similar to people who feel "very socially isolated" without many interpersonal relationships and a history of "negative relationships."   The results from the final test, the "Trauma Symptom Inventory," showed that defendant had suffered trauma and neglect early and throughout his life, beginning with the "abandonment of his parents" in that (1) defendant's father moved to Mexico when defendant was two and only intermittently saw defendant and (2) his mother had various "struggles" resulting in defendant living with his aunt as a child.  Dr. Leska agreed that these results were consistent with the interviews she conducted with defendant's family members.

¶ 15    Dr. Leska further stated that defendant's "significant neglect and *** abandonment," as well as the lack of safety and security made him "very vulnerable to the pull to a gang that he saw as a family." When asked whether, since her interviews with defendant at the Cook County jail, defendant still had a pull toward a gang, Dr. Leska responded, "Of course," noting that defendant had not received sufficient "time or resources or *** help to make any changes." Dr. Leska was asked whether defendant could receive rehabilitative treatment at the Cook County Department of Corrections. Dr. Leska responded, "No. Those kind [*sic*] of rehabilitative resources would be found in prison." Dr. Leska opined that, within a reasonable degree of certainty and based upon his "low average" intellectual functioning, defendant nonetheless had the ability to learn and had "rehabilitative capacity."

¶ 16    On cross-examination, Dr. Leska stated that she charged defense counsel $300 per hour and spent 40 hours on her evaluation and subsequent opinion. Dr. Leska explained that, although defendant was "two weeks shy" of his 18th birthday at the time of the offense, "[a] person's brain development really isn't fully developed until the age of 25." When the State asked whether she was aware that a PSI on defendant had been prepared, Dr. Leska responded, "No, I was not aware of it. I assumed that. That seems to be always the case." Dr. Leska conceded that she did not review any PSI. When asked whether it would surprise her to learn that defendant described having a "normal and respectful relationship" with his mother, Dr. Leska answered, "He may have." She admitted that she would be surprised to know that, during the interview for his PSI, defendant said that he had "a normal childhood and that all of his needs were met." Dr. Leska agreed with the State's comment that "[a] lot" of the information regarding defendant's childhood came from his paternal aunt. Dr. Leska further stated that, although she concluded that defendant had feelings of isolation, she failed to discuss defendant's one-year relationship with a girlfriend

6

despite defendant mentioning it and characterizing it as a "very good relationship." Dr. Leska confirmed that defendant never told her that he wanted to get alcohol or drug treatment or that he would like to "meet with a mental health professional long term."

¶ 17    Dr. Leska was aware that, since defendant's conviction on June 12, 2019, he was charged with "mob action" for an incident in prison on July 18, 2019, in which defendant was alleged to have stabbed another inmate. Dr. Leska, however, conceded that she (1) did not read any police reports regarding the incident, (2) was unaware that there was a video of the incident, and (3) did not discuss this "extremely violent offense" with defendant. When the State asked Dr. Leska "whether or not more violence in the jail affects [defendant's] capacity to be rehabilitated," she merely responded, "No." Dr. Leska further confirmed that, when she met with defendant in January 2020, defendant had been involved in another stabbing-related mob action the prior November, but defendant did not stab the victim and was "just a participant in that beating." Dr. Leska, however, said that she was unaware of the specifics of the incident and did not discuss it with defendant. Dr. Leska explained that there was no test to predict dangerousness "20 years down the road," but admitted that dangerousness "years down the road" was an important factor to determine whether someone can be rehabilitated.

¶ 18    Dr. Leska said she was aware that defendant was still a "very active" member of the "Two Six" gang in jail and was surprised to see new tattoos on defendant's face that he told her were "gang signs." Dr. Leska, however, disputed that this meant defendant was informing others that he was still affiliated with the gang; instead, she said, "it's for his identification that he is."

¶ 19    On redirect examination, defense counsel asked Dr. Leska why she did not interview defendant's mother. In response, Dr. Leska explained that defendant's mother "does not speak English and I didn't think that she would understand some of what I would say" and that she

7

thought defendant's paternal aunt was "very credible." Dr. Leska further stated that defendant's two "jail cases" did not change her opinion because there has not been any "intervention" and that gang affiliation is "kind of survival" there. When asked whether there was any intervention available at the jail, Dr. Leska stated that it had a "high school," but his other charges would preclude him from participating.

¶ 20    The trial court then questioned Dr. Leska. The court noted that there were gangs in the county jail as well as the Department of Corrections and asked whether there would be a difference between the two settings. Dr. Leska stated, "I think that the Department of Corrections offers other resources, counseling, school, group therapy. So I think there are resources that aren't available at Cook County Jail." When asked whether there was an indication that defendant wanted to engage in any of those resources, Dr. Leska recounted that defendant "seemed to be rethinking *** his gang involvement." The court asked whether that was valid in light of his two charged offenses while incarcerated. Dr. Leska reiterated that defendant's only sense of family "came from these people," and she disagreed that she was being optimistic. She stated her belief that more "stability and structure and *** safety" would enable defendant to engage with these programs. The court finally asked whether her opinion on his rehabilitation would change if defendant chose not to utilize the resources. Dr. Leska said, "*** if he doesn't utilize the resources, I'm not sure how helpful they could be. ***. Secondly, the testing did not indicate that this was an incorrigible person, ***." Dr. Leska, however, immediately stated that, although she did not test for incorrigibility, it was nevertheless "not indicated" on the testing she did administer. Following Dr. Leska's testimony, the cause was continued.

¶ 21    At a hearing on September 30, 2020, the court stated that the initial PSI became "somewhat dated" and ordered a second PSI to be prepared, which was filed with the court.[2]  The court noted that in this second PSI, defendant now stated that he denied committing the murder and that he "felt pressured to do a jury trial" despite his desire for a bench trial.  The court construed this as a *pro se* postconviction claim of ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).  The cause was then continued multiple times due to the pandemic.

¶ 22    On June 25, 2021, the court rejected defendant's putative claim of ineffective assistance of counsel under *Krankel*.[3]  The court ordered another PSI and continued the matter "to complete the sentencing hearing and proceed to sentencing."

¶ 23    Defendant's updated PSI (his third) was filed with the court on August 18, 2021.  This PSI indicated that defendant again claimed that he did not commit the offense; instead, defendant stated that there was "an altercation that led to a shooting, but [defendant] did not know the offender or victim."  Defendant further reiterated his claim that his attorney pressured him into having a jury trial instead of a bench trial.  This PSI was otherwise substantially the same as his initial PSI.

¶ 24    On September 16, 2021, defendant's sentencing hearing resumed.  The victim's father read his victim impact statement to the court, stating that life for his family had been a struggle without the victim.  The victim's father asked that defendant not receive any leniency and should instead receive "the harshest penalty available."   The State then read two additional victim impact statements from the victim's grandmother and aunt, respectively.  The grandmother's statement expressed "unbearable" pain at the victim's death and described the victim as "a kind child that would have left you alone before ever hurting you in any[ ]way."  The statement of the victim's

---

[2]  As the State notes, the PSI ordered on September 30, 2020, is not a part of the record.
[3]  Defendant does not challenge the trial court's denial here.

aunt also confirmed that the victim's death caused great pain, and the aunt asked that the court sentence defendant to life imprisonment because defendant showed no remorse.

¶ 25    The State then presented its argument in aggravation, noting that defendant, whose nickname "Balas" meant "bullets," committed the offense seven days prior to his 18th birthday. The State argued that there was "overwhelming aggravation" warranting a "substantial" sentence. Defense counsel asked that the trial court consider Dr. Leska's testimony regarding defendant's trauma and neglect.  The defense also asked the court to refrain from imposing a "substantially high" sentence.  Defendant elected not to make a statement in allocution.  The court then continued the matter to review the testimony and arguments.

¶ 26    On October 15, 2021, the trial court announced its findings.  The court first stated that it considered the trial evidence, the PSI, aggravating and mitigating evidence (including the victim impact statements), statutory mitigating and aggravating factors, "the financial impact on [*sic*] incarceration," and the arguments of counsel.  The court further noted that defendant declined to provide a statement in allocution.  The court also considered "defendant's criminal background, the testimony of the expert in mitigation[,] and the case law in *Miller v. Alabama* and the Illinois case of *People v. Buffer*."

¶ 27    The trial court then noted that, although Dr. Leska described a "troubled, unstable childhood," she could not explain or respond on cross-examination that her description was "contradicted by the defendant's own statement through the [PSI]."  The court further stated that it was "particularly aggravating" that defendant had been sentenced to probation for "unlawful use of a firearm" in December 2015 and then committed this shooting in December 2016.  The court also explained, "despite what Dr. Leska may have opined, *** prior to this arrest and conviction, [defendant] was directed to participate in a program that would enhance him and make him a

10

beneficial or fruitful member of society, and he chose not to do so." The court further observed that, while incarcerated in the Cook County jail awaiting trial on the charges at issue in this case, defendant was charged with mob action and attempted murder. On the attempted murder charge, the court noted that there was a video recording of defendant using a weapon and causing bodily harm to another inmate.

¶ 28 The trial court then discussed the testimony of Dr. Leska in greater detail. The court recounted that, when she opined that defendant had the potential for rehabilitation, the court questioned why defendant's rehabilitative potential would be any different in the Department of Corrections compared to the county jail, if defendant had not "availed himself of any benefits or any assistance or any programs [there]." The court recalled that Dr. Leska distinguished between the county jail and the Department of Corrections despite the court pointing out that there are gangs and other "influences" in both settings. The court summarized her testimony that the Department of Corrections offered other resources and programs, such as counseling, school, group therapy, that she believed were unavailable at the county jail.

¶ 29 The court then expressed its disagreement with Dr. Leska's testimony and noted that there were "several" programs at the county jail. The court explained, ", I see *** on a regular basis, people similarly situated as [defendant] come before me ***, and they present to me all kinds of awards, diplomas, certificates, etc., things that they have done to better themselves ***." The court said it believed opportunities for defendant were present at the county jail and noted that defendant had by that time already spent "a long time" in jail. The court then made the following observations: "And what did Mr. Romero do? Instead of availing himself in [*sic*] programs, he committed crimes. He committed crimes affiliated with his gang, which *** seems to be the area that [defendant] was gravitating to." The court added that defendant had obtained additional "gang

11

tattoos" to show his gang affiliation, in what the court's view was to "show his pride in being a member of the Two-Six street gang."

¶ 30    The court then stated that, since defendant was "barely" under the age of 18 at the time of the offense, it was evaluating the various mitigating factors pursuant to section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2020)).  The court found that, regarding the first factor, Dr. Leska stated that defendant was intelligent and could "learn and *** benefit," so defendant suffered from no developmental disability.  As to the second factor, regarding peer pressure and outside influences, the court found that his street gang membership was "sort of an influence," which the court believed defendant "wears with pride" to the extent that his nickname, translated into English, means bullets.

¶ 31    Turning to the third factor, defendant's background and home environment, the court noted that there was a conflict because defendant stated that he suffered no neglect, abuse, or trauma, whereas Dr. Leska believed there was after speaking with his family.  Nonetheless, the court commented that there was no history of intervention by any public agency or the police department.

¶ 32    The court then turned to the seventh factor and found that, based upon its "observation throughout the trial," defendant was able to meaningfully participate in his defense.  The eighth factor concerned defendant's prior juvenile history.  The court reiterated that, at the time of the offense, defendant had been on probation for a gun-possession offense.

¶ 33    The ninth factor, which the court stated was "any other information the Court finds relevant in relying on, including an expression of remorse," weighed against defendant because, according to the court, "There's been no expression of remorse in this record at all by the defendant.  In fact[,] throughout these proceedings he has not shown one iota of contrition or sorrow or any compassion at all for the person that he brutally murdered in cold blood, no feeling whatsoever."

¶ 34    The court then returned to the remaining three factors:  defendant's potential for rehabilitation, the circumstances of the offense, and his degree of participation in the offense.  The court stated that it had already noted that defendant had been on probation for a gun-related conviction and "decided he was not going to comply with Judge Mendoza's order and get school[ing] to better himself."  The court then found that the evidence indicated that defendant planned and directed the offense when he "put the bullets into that gun" and concealed it on his person, "knowing full well that he was going through some sort of screening at this party in which they were going to search for weapons."  The court added that defendant knew that, after concealing the gun and bringing it into the party, the other people at the party would have been unarmed.  The court stated that defendant's act of shooting an unarmed individual was "[a]n act of cowardice and *** depravity."  The court reiterated that defendant was involved in two offenses while incarcerated, one of which involved him stabbing another inmate.  The court found Dr. Leska's opinion "very naive" and concluded, "[I]f you look at this objectively, you look at what he did before the crime, during the crime and after the crime, there is nothing in this record that indicates that there is one single shred of rehabilitative fiber in [defendant's] body."  The court found that, instead, defendant was "on his way to a long life of crime."  The court further found that defendant's conduct established that he was "permanently incorrigible and *** irreparable."  The court said it could not find "any basis at all" for rehabilitation.

¶ 35    The court then addressed defendant, stating, "It's time for you *** to be held responsible for your decisions; your decisions when you were put on juvenile probation, your decision when you committed this first-degree murder, your decision when you decided to enhance and embrace, exacerbate the gang life in Cook County Jail."  The court then sentenced defendant to 39½ years for the first-degree murder conviction.  With respect to the firearm add-on, the court noted that the

jury found that defendant had personally discharged a firearm proximately causing the death of the victim during the commission of the first-degree murder. After stating that it was "mindful of the necessary findings and restrictions of juvenile sentencing" in *Miller v. Alabama* and *People v. Buffer*, the court said that its failure to include the firearm add-on to defendant's sentence "would be definitely in the face of the legislative intent." The court then stated as follows:

> "This society and this city is undergoing an assault through firearm crimes. It's outrageous what is happening. And that is why the legislature enacted the firearm enhancement provisions for purposes like this. And for me not to sentence him for committing a first-degree murder when he personally was the one who discharged a firearm, I do not think that would be following what the intent of the legislature is to eradicate this cancer and this pervasive gun violence that has beset our city."

After reiterating that it was "mindful of the findings and restrictions" in *Miller v. Alabama* and *People v. Buffer*, the court sentenced defendant under the firearm enhancement to an additional 25 years, to be served consecutively to his 39½-year first-degree murder sentence.

¶ 36    Defendant subsequently filed a motion to reconsider sentence. Defendant argued, *inter alia*, that the trial court failed to "properly balance any aggravation presented with the mitigation evidence presented by the defendant," noting that Dr. Leska testified that he had the ability to learn and rehabilitative capacity. Defendant further argued that his sentence was excessive "in view of the facts of this case" as well as his background. Defendant also argued that there was no evidence that he was "among the rarest of juvenile offenders whose crime reflects permanent incorrigibility" and that the State had not proven that he was "totally irredeemable and unable to be rehabilitated."

Finally, defendant noted that he was under the age of 18 at the time of the offense and that the court failed to consider additional mitigating factors pursuant to section 5-4.5-105 of the Code, characterizing his sentence as a *de facto* life sentence. The court denied defendant's motion.

¶ 37    This appeal follows.

¶ 38                                ANALYSIS

¶ 39                          Defendant's Sentence

¶ 40    On appeal, defendant contends that his 64½-year sentence of imprisonment is an unconstitutional *de facto* life sentence as applied to him under the eighth amendment and the proportionate penalties clause of the Illinois constitution. Defendant argues that the trial court did not "meaningfully" consider his "youth and its attendant circumstances," his education level, intellectual functioning, impoverished upbringing, and lack of parental guidance. In the alternative, defendant contends that his sentence is excessive. Defendant asks that we either reduce his sentence or remand the matter for resentencing.

¶ 41                        *The Eighth Amendment Claim*

¶ 42    The eighth amendment, applicable to the states through the fourteenth amendment, (*Robinson v. California*, 370 U.S. 660 (1962)), prohibits, *inter alia*, the imposition of "cruel and unusual punishments" (U.S. Const., amends. VIII, XIV), which include those that are "disproportionate" to the offense (*Graham v. Florida*, 560 U.S. 48, 59 (2010)). With respect to juveniles, the United States Supreme Court has held that the eighth amendment prohibits (1) capital sentences for juveniles who commit murder (*Roper v. Simmons*, 543 U.S. 551, 578-79 (2005)), (2) mandatory life sentences for juveniles who commit nonhomicide offenses (*Graham*, 560 U.S. at 82), and (3) mandatory life sentences for juveniles who commit murder (*Miller v. Alabama*, 567 U.S. 460, 489 (2012)). The Supreme Court later explained that, under *Miller*, life

15

imprisonment without parole is unconstitutional for "juvenile offenders whose crimes reflect the transient immaturity of youth"; that is, "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery v. Louisiana*, 577 U.S. 190, 208-09 (2016). Our supreme court further held that sentencing a juvenile to a mandatory term of years that is the functional equivalent of life without the possibility of parole (*i.e.*, a *de facto* life sentence) violates the eighth amendment. *People v. Reyes*, 2016 IL 119271, ¶ 9.

¶ 43    Our supreme court extended *Miller* and *Montgomery*, holding that the eighth amendment also requires a judge to consider a juvenile defendant's youth and attendant characteristics before imposing a *discretionary* sentence of life in prison. See *People v. Holman*, 2017 IL 120655, ¶ 40.[4] Among the factors a court should consider are the following: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's

---

[4] Recently, our supreme court commented that the holding in *Holman* was "questionable" in light of the Supreme Court's decision in *Jones v. Mississippi*, 593 U.S. ──, ──, 141 S. Ct. 1307, 1311 (2021) (rejecting an argument that the "sentencer must make a finding of permanent incorrigibility" prior to imposing a discretionary life sentence without parole). *People v. Dorsey*, 2021 IL 123010, ¶¶ 40-41. This comment appears to be *dicta*, however, because the question presented to the *Dorsey* court did not concern the sufficiency (or necessity) of a trial court's fact findings prior to imposing a *de facto* life sentence. See *id.* ¶ 49 ("In the case now before us, the parties disagree on the effect the availability of day-for-day, good-conduct credit has on the question of whether a *de facto* life sentence without the possibility of parole has been imposed."). Since *Holman* has not been expressly overruled, we are bound to still follow it. See *Kaull v. Kaull*, 2014 IL App (2d) 130175, ¶ 55 ("Trial and appellate courts are bound by the supreme court and have no authority to overrule the supreme court or modify its decisions.") (citing *Angelini v. Snow*, 58 Ill. App. 3d 116, 119 (1978)).

incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. *Id.* ¶ 46.

¶ 44   Section 5-4.5.105(a) of the Code requires a trial court to consider the following mitigating factors before sentencing a defendant who committed an offense before the age of 18:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

17

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate." 730 ILCS 5/5-4.5-105(a) (West 2020).

This final factor, however, precludes a court from considering a defendant's lack of an expression of remorse as an aggravating factor if the defendant, "on advice of counsel chooses not to make a statement." 730 ILCS 5/5-4.5-105(a)(9) (West 2020).

¶ 45 In addition, section 5-4.5-105(b), in pertinent part, allows a trial court the discretion to "decline to impose any otherwise applicable sentencing enhancement based upon firearm *** possession with personal discharge that proximately causes *** death to another person." 730 ILCS 5/5-4.5-105(b) (West 2020). We review *de novo* whether a sentence is constitutional. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 46 At the outset, we reject the State's argument that defendant has forfeited this claim of error. Defendant's motion to reconsider his sentence argued in favor of resentencing because, in part, he was not "among the rarest of juvenile offenders whose crime reflects permanent incorrigibility" and that the State had not proven that he was "totally irredeemable and unable to be rehabilitated." These terms are found repeatedly in the United States Supreme Court's eighth amendment jurisprudence. See, *e.g.*, *Miller*, 567 U.S. at 479-80 (noting "the great difficulty" in distinguishing between a juvenile offender whose crime reflects "unfortunate yet transient immaturity, and *the rare juvenile offender* whose crime reflects irreparable corruption.' " (Emphasis added.)) (quoting *Roper*, 543 U.S. at 573); *id.* at 478 (stating that mandatory life imprisonment without parole "disregards the possibility of *rehabilitation* even when the circumstances most suggest it." (Emphasis added.)); *Montgomery*, 577 U.S. at 209 ("*Miller* did bar life without parole, however, for all but the *rarest of juvenile offenders*, those whose crimes reflect *permanent incorrigibility*."

(Emphases added.)); *Graham*, 560 U.S. at 75 ("Those who commit truly horrifying crimes as juveniles may turn out to be *irredeemable*, and thus deserving of incarceration for the duration of their lives." (Emphasis added.)); see also *Holman*, 2017 IL 120655, ¶ 46 ("Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, *permanent incorrigibility*, or irreparable corruption beyond the possibility of *rehabilitation*." (Emphases added.)). Although we recognize that defendant did not explicitly cite *Miller* or the eighth amendment to the federal constitution in his motion, defendant's statements are hardly cryptic. The State's claim of forfeiture is therefore unpersuasive. We now turn to defendant's claim.

¶ 47 As noted above, defendant contends that the trial court imposed a sentence in violation of the eighth amendment. Specifically, defendant argues that, although the court here "acknowledged its awareness of the statute," it nevertheless did not "meaningfully" apply the statutory factors in section 5-4.5-105(a) before imposing sentence. Defendant further complains that the trial court erroneously rejected Dr. Leska's expert opinion that defendant was not permanently incorrigible or beyond rehabilitation, adding that the state produced no witnesses or evidence to contradict her opinion. Finally, he argues that the court's "intense and highly skeptical questioning of Dr. Leska *** suggested a bias or predetermination" with respect to defendant's rehabilitative potential.

¶ 48 Defendant's contention of error is unavailing. First, defendant's argument that the trial court did not provide meaningful consideration to his youth and the attendant circumstances is belied by the record: The trial court's findings at the sentencing hearing span approximately 14 pages of the report of proceedings, refer repeatedly to defendant's age as well as his individual circumstances, and reflect a meticulous examination of each of the statutory factors. We have already detailed the court's discussion of those factors *supra*, so we need not repeat them here. To

the extent that defendant is inviting this court to reweigh the mitigation evidence, it is an invitation we must decline. See *People v. Alexander*, 239 Ill. 2d 205, 214-15 (2010) (holding that it is "an improper exercise of the powers of a reviewing court" for the appellate court to substitute its own judgment for that of the trial court merely because it would have weighed the sentencing factors differently) (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991)).

¶ 49    Regarding Dr. Leska's testimony, it is well established that a trial court may "accept or reject expert testimony in whole or in part and need not accept the opinion of one expert even where that expert's testimony is not contradicted by the testimony of another expert." *People v. Jones*, 2017 IL App (1st) 143403, ¶ 27 (citing *People v. Tara*, 367 Ill. App. 3d 479, 489 (2006)). Here, although Dr. Leska was aware that, while defendant was incarcerated pending trial in the present case, he stabbed another inmate and later participated in a separate "mob action" (resulting in two additional charges against him), she nonetheless failed to review police reports or footage of—or ask defendant about—either of these two violent incidents.

¶ 50    In addition, although Dr. Leska opined that defendant had suffered abuse and neglect as a child based primarily upon an interview with defendant's aunt (but not his mother or sister), she admitted that she was unaware but "assume[d]" that defendant's PSI had been prepared because that "seem[s] to be always the case." As discussed, defendant's PSI contained his statement that he had a good relationship with his mother and sisters, was never abused or neglected, and had a normal childhood in which "all of his needs were met." The court also observed that there had been no "public agency" or police involvement in defendant's childhood family life. Furthermore, she asserted that defendant had feelings of isolation and failed to discuss defendant's relationship with a girlfriend even after defendant mentioned it and described it as "very good."

¶ 51    Finally, Dr. Leska seemingly explained away defendant's violent offenses while in jail by stating that he lacked sufficient time or resources to "make any changes" and that those types of "rehabilitative resources" were only in the state prison system and not the county jail.  In response to the court's question, she reiterated her belief that "the Department of Corrections offers other resources, counseling, school, group therapy *** that aren't available at Cook County Jail."  A cursory search of the sheriff's department website, however, would have revealed multiple programs available at the Cook County jail, including substance abuse, mental health, educational, and religious programs, as well as yoga and chess.[5]  Dr. Leska testified that she charged the defense approximately $12,000 for this expert opinion.  The facts of this case strongly suggest that she blithely ignored information that would contradict her opinion.  As such, the court had ample grounds to reject it.  See *Jones*, 2017 IL App (1st) 143403, ¶ 27.

¶ 52    Nonetheless, defendant asserts that there was "no sound basis" for the court to reject Dr. Leska's opinion and relies upon *People v. Kando*, 397 Ill. App. 3d 165 (2009), in support of his claim.  Defendant's reliance upon *Kando*, however, is misplaced.  In that case, the court (with one justice dissenting) reversed the trial court's finding of guilty but mentally ill and remanded the matter for further proceedings.  *Id.* at 211-12.  In particular, the *Kando* court noted, "it is undisputed *** that the incident for which defendant was charged [namely, stabbing his neighbor] was conceived and took place in the grip of a psychotic delusion[:]  *** to eliminate Satan pursuant to a commandment from God."  *Id.* at 196.  The court further stated that the two expert opinions considered "relevant authorities" and information concerning the defendant, and they did not

---

    [5]    See Rehabilitative Programs, https://www.cookcountysheriff.org/departments/cook-county-department-of-corrections/programs-and-services/sheriffs-rehabilitative-programs/ (last visited January 6, 2023).

"ignore[] information which was contrary to their opinion[s]." *Id.* at 197. Both experts also testified that they "thoroughly" reviewed all available information on the defendant's condition, including police reports. *Id.* at 198. The court also stated that both experts' credibility was further bolstered because they were employed by the Forensic Clinical Services of the Cook County circuit court "and therefore examined defendant pursuant to court orders. Neither expert was hired by defendant to examine him and then provide an opinion at trial." *Id.*

¶ 53    Here, by contrast, there is no evidence in the record that a religious delusion motivated defendant to shoot the victim, and as noted above, the expert in this case, Dr. Leska—who was hired by defendant and not the court—freely admitted that she failed to review defendant's multiple PSIs, which contained information about his upbringing that was contrary to her opinion, unlike the experts in *Kando*. See *id.* Defendant's reliance upon *Kando* is therefore unavailing.

¶ 54                                 *The Proportionate Penalties Claim*

¶ 55    Defendant next contends that his sentence violates the proportionate penalties clause of the Illinois constitution as applied to him. Defendant argues that the trial court "overlooked the substantial mitigating evidence" and disregarded the constitutional objective of restoring defendant to useful citizenship. Defendant adds that the court's imposition of the 25-year firearm enhancement was based "solely on retribution and deterrence" without regard to defendant's youth and the circumstances thereof. Defendant quotes the court's statement that "society" and the city are "undergoing an assault through firearm crimes." Defendant notes that the deterrent effect of sentences is weaker with minors than adults, and he argues that, "at a minimum," this court should vacate the 25-year firearm enhancement. The State responds that this claim is forfeited.

¶ 56    The proportionate penalties clause of the state constitution provides in relevant part that "All penalties shall be determined both according to the seriousness of the offense and with the

22

objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). We may determine whether a sentence shocks the moral sense of the community by considering both objective evidence and "the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008). As noted above, our review as to the constitutionality of a sentence is *de novo*. *Taylor*, 2015 IL 117267, ¶ 11.

¶ 57 In this case, defendant's contention is an as-applied challenge. Specifically, defendant argues that the trial court improperly "overlooked the substantial mitigating evidence," disregarded the constitutional objective of restoring defendant to useful citizenship, and imposed the firearm add-on solely on the basis of retribution and deterrence. The State responds that defendant has forfeited this claim for failure to raise it at sentencing or in his postsentencing motion.

¶ 58 Although the defendant raised his challenge for the first time on appeal, he has not forfeited review. Our supreme court has held that a defendant ordinarily must present an as-applied challenge to the trial court to create "a sufficiently developed record." *Holman*, 2017 IL 120655, ¶29. That court, however, noted that there is a "very narrow exception" to that rule for an as-applied *Miller* claim where the record is already sufficiently developed for appellate review. *Id.* ¶¶ 29-32 (citing *People v. Davis*, 2014 IL 115585, ¶¶ 32, 43). The court further explained that "[l]ike the *Miller* claim in *Davis*, the *Miller* claim in this case does not require factual development. All of the facts and circumstances to decide the defendant's claim—that his sentencing hearing did not comply with *Miller*—are already in the record." *Id.* ¶ 32.

¶ 59 The issue presently before this court falls into the narrow *Davis* exception referred to in *Holman*: whether the trial court improperly disregarded mitigating evidence and misapplied the

*Miller* factors.  In addition, the record here is sufficiently developed for us to determine whether defendant's proportionate penalties claim has merit.  See *id.*; *cf. People v. Harris*, 2018 IL 121932, ¶¶ 43-44 (distinguishing *Holman* because "the defendant in *Holman* fell squarely under *Miller* because he was a juvenile when his crime was committed.  The critical determinations were purely legal issues *** [and] [t]he only other issue was determining from the 'cold record' whether the trial court adequately considered the *Miller* factors at the original sentencing hearing.").  The State's response that defendant has forfeited this claim is thus unavailing.

¶ 60    On the merits, defendant's sentence, although not the statutory minimum, was nonetheless well within the sentencing range.  We note that defendant must serve the entire 64½-year sentence without the possibility of good-conduct credit (730 ILCS 5/3-6-3(a)(2)(1)(i) (West 2020)).  Nonetheless, the facts of this case are particularly egregious.  The victim, in an unprovoked attack, was struck over the head with a glass bottle.  The victim and his brother then had to defend themselves from four or five unknown Hispanic males with whom they had no prior dispute.  After the victim's brother was pushed to the floor and the victim had to defend himself alone, defendant shot the unarmed victim twice in the chest, killing him.  Defendant was not involved in the fight and had concealed the weapon to evade protective pat-down searches at the party.  At the time of this offense, defendant had been on probation for a prior juvenile adjudication for possession of a weapon.  Subsequent to this offense (*i.e.*, while incarcerated awaiting trial for the victim's shooting), defendant stabbed another inmate and later participated in a separate "mob action" beating of yet another inmate.  On these facts, defendant's 64½-year sentence is not "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *Sharpe*, 216 Ill. 2d at 487.  On this basis alone, defendant's claim fails.

¶ 61    Additionally, we reject defendant's argument that the trial court disregarded the mitigating evidence. Setting aside whether a trial court's failure to consider mitigating evidence at sentencing can support a state *constitutional* challenge under the proportionate penalties clause (see *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 61), the trial court stated in its lengthy findings that it had considered, *inter alia*, defendant's PSI, the evidence in aggravation and mitigation, statutory factors in aggravation and mitigation, as well as the trial evidence. Moreover, it is well established that a trial court is not required to expressly outline its reasoning for sentencing, and absent some affirmative indication to the contrary (other than the sentence itself), we must presume that the court considered all mitigating factors on the record. *People v. Perkins*, 408 Ill. App. 3d 752, 762-63 (2011). Defendant's claim is therefore without merit.

¶ 62    Finally, we reject defendant's contention that the trial court erred in imposing the firearm add-on solely on the basis of retribution and deterrence based upon its comments regarding gun violence generally and the purported legislative intent underlying the firearm add-on. The comments defendant complains about were limited to a single paragraph among over a dozen pages of findings at sentencing. To determine whether a sentence is improper, we may not merely focus "on a few words or statements of the trial court"; rather, we must consider "the entire record as a whole." *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986). Therefore, viewing the record of the trial court's findings at sentencing as a whole, it is not reasonable to characterize the sentence as one based solely upon retribution and deterrence. Accordingly, defendant's argument fails.

¶ 63                                    *The Excessive Sentence Claim*

¶ 64    Defendant alternatively contends that his sentence is excessive given his young age and "the absence of evidence that he was permanently incorrigible." Defendant relies upon the same arguments he made *supra* regarding his constitutional challenges to his sentence.

¶ 65    "It is well settled that the trial court has broad discretionary powers in imposing a sentence [citation], and the trial court's sentencing decision is entitled to great deference." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).  The circuit court is afforded such deference because it "has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.*  We may not substitute our judgment for that of the circuit court merely because we would have weighed the sentencing factors in a different manner.  *Id.*  As we have already mentioned, a trial court need not explain its rationale for a particular sentence, and unless a defendant can show "some affirmative indication to the contrary (other than the sentence itself)," we will presume that the court considered all mitigating factors on the record.  *Perkins*, 408 Ill. App. 3d at 762-63.

¶ 66    This court may set aside a sentence only when the trial court abuses its discretion.  *People v. Velez*, 388 Ill. App. 3d 493, 514 (2009).  An abuse of discretion exists "only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court."  *People v. Ramsey*, 239 Ill. 2d 342, 429 (2010) (citing *People v. Donoho*, 204 Ill. 2d 159, 182 (2003)).  In addition, "a sentence within the statutory limits will only constitute an abuse of discretion if 'it is manifestly disproportionate to the nature of the offense.' "  *People v. Martin*, 2012 IL App (1st) 093506, ¶ 47 (quoting *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007)).

¶ 67    In this case, defendant was convicted of first-degree murder, which has a sentencing range of 20 to 60 years' imprisonment.  See 730 ILCS 5/5-4.5-20(a) (West 2016) (first-degree murder sentence of 20 to 60 years).  In addition, the jury found that defendant personally discharged a firearm that proximately caused the victim's death, which then results—for juveniles who commit this offense—in a discretionary additional term of 25 years to natural life imprisonment.  See 730

26

ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016) (25 years to natural life add-on for personal discharge of a firearm proximately causing death); but see 730 ILCS 5/5-4.5-105(c) (West 2016) (firearm add-on discretionary if defendant is under 18 at the time of the offense). Defendant's 64½-year sentence falls within the statutory range for that offense, so we may not set aside the sentence unless it is manifestly disproportionate to the nature of the offense. See *Martin*, 2012 IL App (1st) 093506, ¶ 47. Defendant, however, argues that the sentence is nonetheless improper and reiterates that this is due to his youth and the absence of evidence that he was permanently incorrigible.

¶ 68    Defendant's contention is without merit. We have already detailed the trial court's lengthy findings at sentencing and need only summarize them here: The evidence at trial established that defendant shot the unarmed victim twice in the chest after the victim got into a fight with defendant's fellow gang members (but not defendant) after the victim was struck over the head with a bottle in an unprovoked attack. On these abbreviated facts, defendant's sentence was not manifestly disproportionate to the nature of the offense. See *id.* Finally, we note that section 5-4.5-115(b) of the Code provides in relevant part as follows: "A person under 21 years of age at the time of the commission of first-degree murder who is sentenced on or after June 1, 2019 *** shall be eligible for parole *** after serving 20 years or more of his *** sentence ***." 730 ILCS 5/5-4.5-115(b) (West 2020). Defendant here was one week shy of his 18th birthday and sentenced after June 1, 2019. By the very terms of the statute, he is eligible for parole after 20 years.

¶ 69    Defendant's argument that he is entitled to a reduced sentence because of his age and the purported lack of evidence of incorrigibility seems to be an invitation for this court to reweigh the mitigation evidence. It is, however, an invitation we must decline. See *Stacey*, 193 Ill. 2d at 209. After having reviewed the evidence and the trial court's detailed findings at defendant's sentencing hearing, we cannot hold that the court's consideration of the mitigating evidence was arbitrary,

fanciful, or unreasonable, such that no reasonable person would take its view. See *Ramsey*, 239 Ill. 2d at 429. As such, it did not abuse its discretion. See *Velez*, 388 Ill. App. 3d at 514. We must therefore conclude that defendant's sentence was proper because it was neither greatly at variance with the spirit and purpose of the law nor manifestly disproportionate to the nature of the offense. *Martin*, 2012 IL App (1st) 093506, ¶ 47. Defendant's claim of error is thus unavailing.

¶ 70    Moreover, defendant's citation in his reply brief to *People v. Hill*, 2022 IL App (1st) 171739-B, does not alter our holding. In *Hill*, the defendant was convicted in 1998 of two counts of first-degree murder and one count of attempted first degree murder, which he committed at age 15, and he was sentenced to a mandatory term of life in prison to run consecutively with a 30-year sentence for the attempted murder. *Id.* ¶ 1. The defendant subsequently filed a postconviction petition challenging, *inter alia*, his life sentence as unconstitutional. *Id.* The parties agreed that his mandatory life sentence violated *Miller*. *Id.*

¶ 71    On remand, two corrections officers testified at the resentencing hearing that the defendant was "a model inmate," and his prison records indicated that he held multiple jobs requiring "the trust of officers." *Id.* ¶ 19. The trial court further described the defendant's behavior in prison as " 'close to exemplary' " and " 'at least as good as anyone else's that I've ever seen that has been in that long, quite frankly.' " *Id.* ¶ 20. The court then resentenced the defendant to two concurrent terms of 54 years for first degree murder to run consecutively with a 6-year sentence for attempted murder. *Id.* ¶ 1. The defendant appealed, arguing his new sentences still violated *Miller* and its progeny. *Id.* This court agreed and remanded for a new resentencing hearing. *Id.* ¶ 4.

¶ 72    Here, however, defendant did not have an "exemplary" record while incarcerated, unlike the defendant in *Hill*. Defendant acknowledges this distinction but discounts this fact in arguing that the *Hill* defendant's "behavior and progress was decades in the making" after having spent

"over 20 years" in prison. This is precisely what makes *Hill* distinguishable: the defendant there established his rehabilitative potential, whereas defendant here stabbed one inmate and participated in the beating of another in the very short time he was incarcerated pending trial. In addition, two corrections officers testified at the resentencing hearing that the defendant was "a model inmate," and his prison records indicated several jobs that required the officers' trust. *Id.* ¶ 19. Clearly, defendant here did not benefit from testimony that he was a "model inmate" or that he had prison jobs requiring trust on the part of the officers. *Hill* is therefore unpersuasive.

¶ 73                                  Defendant's Mittimus

¶ 74     Finally, defendant contends, and the State agrees, that the mittimus erroneously shows that defendant was convicted of two counts of murder. We agree with the parties. If only one person has been murdered, there can be only one conviction for murder. *People v. Fuller*, 205 Ill. 2d 308, 346 (2002). Under the one-act, one-crime rule, we must uphold the conviction for the most culpable murder charge and vacate the other less culpable charge. *Id.* (citing *People v. Kuntu*, 196 Ill. 2d 105, 130 (2001)). Intentional murder has a more culpable mental state than knowing murder. *Id.* at 346-47. Here, both count V (intentional murder) and count VI (knowing murder) alleged defendant committed first-degree murder when he "shot and killed [the victim] while armed with a firearm." Defendant's one physical act of shooting the victim was the basis of both convictions. We therefore vacate the conviction for knowing murder, count VI of the indictment.

¶ 75                                  CONCLUSION

¶ 76     Defendant's sentence is not an unconstitutional *de facto* life sentence in violation of the eighth amendment or the proportionate penalties clause of the Illinois constitution, and it is not otherwise excessive. We vacate one of defendant's murder convictions, however, pursuant to the one act, one crime rule. Accordingly, we affirm as modified the judgment of the circuit court.

¶ 77    Affirmed as modified.